DYNAMICS CORPORATION OF AMERICA, Plaintiff,

v.

CTS CORPORATION, Robert D. Hostetler, Gary B. Erekson, Joseph DiGirolamo, George F. Sommer, Gerald H. Frieling, Jr., Don J. Kacek, Ted Ross, and Richard M. Ringoen, Defendants.

No. 86 C 1624.

United States District Court, N.D. Illinois, E.D.

April 17, 1986.

Lowell Sachnoff, Dean A. Dickie, Sarah R. Wolff, Jeffrey E. Stone, Michael J. Kaufman and Thomas J. Bamonte, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff.

Stephen C. Sandels, Gary L. Prior, Mark L. Yeager, J. Craig Busey, William P. Schuman and David Marx, McDermott, Will & Emery, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

Plaintiff Dynamics Corporation of America ("DCA") filed the present action on March 10, 1986, seeking injunctive relief under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), in connection with what it alleged to be gun-jumping and unlawful proxy solicitations communicated by defendant CTS Corporation ("CTS") and its management to CTS shareholders. The same day it filed this action, DCA, a 9.7% shareholder in CTS (554,600 shares) announced a tender offer for up to 1,000,000 CTS shares at $43 a share, a premium of $8 over market, and announced an intention to wage a proxy contest to elect its own slate of directors to the CTS board. The offer, if successful, would increase DCA's interest to approximately 27.7% of CTS.

The stated purpose of the tender, as set forth in DCA's Schedule 14d–1 and the Offer to Purchase, is 1) to increase DCA's equity in CTS, and 2) to enhance DCA's ability to obtain control of the company. The offer further states that DCA intends to seek control "by causing its nominees to be elected to the Board of Directors … at the [April 25, 1986] Annual Meeting of the Company's stockholders."

DCA's announcement of the tender led to certain defensive reactions of CTS management and a consequent expansion of the claims before this court. The matter at issue in this opinion is DCA's motion to preliminarily enjoin a shareholder rights plan adopted by the CTS Board on March 22, 1986 for the admitted purpose of warding off DCA's hostile tender offer. Under this plan, CTS shareholders received a dividend distribution of one "right" per share at the close of business on April 3, 1986. The rights are worth nothing unless and until certain "triggering events" occur. The first of these triggering events, or "flip-in" provision, occurs when any person or group acquires 15% or more of CTS's common stock. At that time, the rights become nonredeemable and entitle all holders of CTS stock other than the acquiror (whose rights become null and void) to purchase a unit of CTS securities, consisting of a fractional share of CTS common stock and debentures, at a price equal to 25% of the then current market value (i.e., pre-trigger value) of such securities. The object of this "flip-in" is to inflict on the acquiror an immediate economic loss, and thereby to force all such hostile bidders to negotiate with management before making an unsolicited acquisition.

The second trigger, or "flip-over" provision, occurs upon the acquisition of CTS in a merger, business combination, or the sale of all or the majority of its assets. Upon this "flip-over" event, the right entitles the holder, for an exercise price of $75, to purchase common stock of the company acquiring CTS having a market value of $150.

The heart of this controversy revolves around the "flip-in" provision of the CTS plan. DCA's tender offer is currently oversubscribed, and, under its terms, DCA must purchase the full 1,000,000 shares. Upon so doing, DCA will hold 1,554,600 of the 5,650,800 outstanding shares of CTS stock, or 27.5%. After the flip-in provisions are triggered, however, 1,849,000 flip-in shares (all of CTS's authorized but unissued stock) and up to $80,000 in debentures will be issued to all the other CTS shareholders. Assuming that all other CTS shareholders exercise their rights, DCA will then own 1,554,600 of 7,499,800 shares, or 20.7% of CTS, whose own value will

decrease because of the new debt issued. According to CTS's own calculations in adopting the plan, this dilution would impose an economic loss of approximately $24 million on DCA should it complete its acquisition.

## Governing Law

The parties agree that Indiana law governs the validity of the CTS directors' actions in this case. CTS has further advised the court that Indiana courts generally look to Delaware decisions in matters of corporate law. *See, e.g., Shaffer v. General Grain, Inc.,* 133 Ind.App. 598, 182 N.E.2d 461, 468 (1962); *Dotlich v. Dotlich,* 475 N.E.2d 331, 343 (Ind.App.1985); *Dynamics Corp. of America v. CTS Corp.,* 479 N.E.2d 1352, 1355 (Ind.App.1985). The parties have both cited and argued controlling Delaware Supreme Court opinions, and the court accepts this characterization of Indiana law as accurate.

## Standards for Injunctive Relief

A preliminary injunction should issue upon the following showings: 1) the movant must show a probability of success on the merits; 2) that it has no adequate remedy at law and will suffer immediate and irreparable injury if injunctive relief is not granted; 3) that the harm of not granting an injunction outweighs the irreparable harm that defendants may suffer if the relief *is* granted; and 4) that an injunction will not harm the public interest. *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–88 (7th Cir.1984). Although the Seventh Circuit has on occasion engrafted certain formalisms onto this traditional test, *see, e.g., American Hospital Supply Corp. v. Hospital Products Ltd.,* 780 F.2d 589 (7th Cir.1986), the traditional formulation of the test still governs. *Lawson Products, Inc. v. Avnet, Inc.,* 782 F.2d 1429, 1432–36 (7th Cir.1986).

## Legal Discussion

Because of time pressures, the court will not relate a separate narrative of facts, but simply discuss the facts as they bear on the court's ultimate determination. DCA has alleged that CTS's shareholder rights plan, a variant of what has commonly come to be known as a "poison pill," is illegal and should be invalidated. In particular, DCA argues that the rights plan unlawfully establishes two classes of stock and unlawfully discriminates among shareholders, and that Indiana law, which governs this claim, prohibits its implementation. Alternatively, DCA argues that defendants breached their fiduciary duties to CTS and its shareholders by adopting the plan in response to the DCA tender offer.

To support the first of these arguments, DCA notes that the CTS Articles of Incorporation do not authorize the board to issue classes of shares with different "relative rights, limitations, preferences and qualifications" and that CTS shareholders have a statutory right to vote on any amendment to those Articles which would create a new class of shares. Ind.Stat. Ann. § 23–1–4–4(a)(8). Because the rights plan effectively creates one class of shares with enhanced voting power and dividend rights based on whether the stockholder owns in excess of 15%, DCA claims that the CTS rights plan violates these statutory restrictions.

The court disagrees. Corporations organized under Indiana law are empowered both to pay dividends and to create and issue rights and options. Ind.Code § 23–1–2–7 (pre-April 1, 1986); Ind.Code. § 23–1–26–5 (governing CTS as of April 1, 1986). The plan makes clear that what is involved are the issuance of rights, which at present trade with the common, and not a second class of stock. Moreover, the rights at present are attached to all shares, including DCA's. That DCA might subsequently take actions which will cause it to forfeit those rights does not make the rights themselves a new class of stock. As provided in *Providence & Worcester Co. v. Baker,* 378 A.2d 121, 123 (Del.1977), restrictions upon stockholders are distinguishable from restrictions on the stock itself.

The cases cited by DCA do not convince the court otherwise. In *Unilever Acquisition Corp. v. Richardson-Vicks, Inc.,* 618 F.Supp. 407 (S.D.N.Y.1985), the court inval-

idated a new class of stock which provided for different voting rights within the same class of stock, depending on when the stock was acquired. In *Asarco, Inc. v. Court*, 611 F.Supp. 468 (D.N.J.1985), the district judge concluded that New Jersey law does not permit amendments which would redistribute voting power within a class or series of stock, and invalidated a board of directors' attempt to achieve that result. In *Minstar Acquiring Corp. v. AMF, Inc.*, 621 F.Supp. 1252 (S.D.N.Y.1985), the court specifically declined to follow Delaware law, and the rights were nontransferable, a fact on which the court relied.

In *Unilever* and *Asarco*, the rights plan constituted a pure vote altering scheme with no economic consequences; the cases stressed that the plans directly altered voting power of stock depending on when it was transferred. The court does not think that the rationale of those cases should be extended to a poison pill dividend of the sort issued here. In *Telvest, Inc. v. Olson*, Slip Op. No. 5798 (Del.Ch. March 8, 1979) [available on WESTLAW, Allstates database] (available on LEXIS), the Delaware chancery court similarly held that direct alteration of voting rights cannot be accomplished without shareholder approval. Yet the Delaware Supreme Court in *dicta* recently confirmed the statutory authority of a board to issue a discriminatory note purchase rights plan in response to a coercive two-tier tender offer. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 180 & n. 11 (Del.1986). The court specifically relied on that portion of the Delaware Code which allows corporations to issue rights or options. *Id.* DCA has therefore failed to establish probability of success on its claim that the rights plan was unauthorized under Indiana law.

DCA secondly argues that the rights plan unlawfully discriminates against it and all other CTS stockholders who would acquire over 15% of CTS's outstanding common stock. The court disagrees. In *Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (Del.1985), Unocal, in response to what it perceived as an inadequately priced tender offer from Mesa, countered with an exchange offer for its own shares. The offer intentionally excluded Mesa from participating. The Delaware Supreme Court rejected Mesa's argument that it was unlawfully excluded from sharing in a benefit available to all other shareholders:

> In this situation, there is no support in Delaware law for the proposition that, when responding to a perceived harm, a corporation must guarantee a benefit to a stockholder who is deliberately provoking the danger being addressed.

493 A.2d at 958.

In this case, defendants have determined that any CTS stockholder who acquires 15% of CTS stock without Board consent poses a "danger" to the corporation which is sufficient grounds for denying a benefit to that shareholder. Whether that determination is reasonable or not is a separate issue from whether or not the Board was statutorily empowered to issue a rights plan which discriminates against certain CTS stockholders based upon their actions. The court therefore turns to DCA's final arguments regarding alleged breach of fiduciary duty by defendant CTS's Board of Directors.

The starting point for analysis of this final question is the Delaware Supreme Court case of *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985). In that case, the court held that a board of directors has an active role to play in responding to a pending takeover bid, and that the business judgment rule applies to defensive mechanisms adopted by the board in the face of such bids. The court stressed, however, that there are "certain caveats to a proper exercise" of this power: "Because of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders, there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." *Id.* at 954. The court reasoned that directors faced with a threat to control are of necessity confronted with a conflict of interest, and that in the face of

this conflict they must show that "they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed because of another person's stock ownership" and that they could satisfy this burden by showing "good faith and reasonable investigation." *Id.* at 955.

The court then went on to hold that to come within the ambit of the business judgment rule, a defensive measure must also "be reasonable in relation to the threat posed." As explained by the court:

This entails an analysis by the directors of the nature of the takeover bid and its effect on the corporate enterprise. Examples of such concerns may include: inadequacy of the price offered, nature and timing of the offer, questions of illegality, the impact on "constituencies" other than shareholders ... the risk of nonconsummation, and the quality of securities being offered in the exchange.

493 A.2d at 955.

Under this standard, the court then held that a discriminatory self-tender in response to a two-tier "front loaded" cash tender offer was a proper exercise of business judgment. In the course of its opinion, the court noted the following facts: 1) an outside investment advisor had advised the board that the tender offer price was significantly below the bust-up value of the company and was therefore inadequate, *id.* at 950; 2) the eight outside directors met separately with the company's financial advisors and attorneys before deciding to reject the offer, *id.;* 3) the directors centered discussions on the objective of adequately compensating shareholders at the "back-end" of the proposal, which Mesa had proposed to finance with "junk bonds," *id.* at 951; and 4) the board questioned the propriety of the discriminatory exclusion, but determined that it was necessary to further the goal of adequately compensating the back-end shareholders. *Id.* at 951.

In *Moran v. Household International, Inc.*, 500 A.2d 1346 (Del.1985), the Delaware Supreme Court followed *Unocal* to uphold under the business judgment rule the adoption of a "flip-over" poison pill rights plan similar in operation and effect to the second of the two triggers in CTS's rights offering. The Court discussed *Unocal* as incorporating a two-part test in which the initial burden of proof falls squarely on the directors:

The "directors must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed ... [T]hey satisfy that burden 'by showing good faith and reasonable investigation ....'" In addition, the directors must show that the defensive mechanism was "reasonable in relation to the threat posed."

500 A.2d at 1356 (citations omitted).

The plan at issue provided for the issuance of certain rights per common share upon the announcement of a tender offer for 30% or the acquisition of 20% of Household's shares by anyone. Upon the latter event, the rights would become nonredeemable and would be exercisable at a price concededly out of the money, i.e., 1/100 of a share of preferred stock for $100. However, if a right is not exercised for preferred, and thereafter a merger or consolidation occurs, the rights holder would be allowed to exercise each right to purchase $200 of the common stock of the tender offeror for $100. This "flip-over" provision, to use the court's words, was "at the heart of [the] controversy." 500 A.2d at 1349.

The court held that the adoption of the plan was a reasonable business decision to protect the company from coercive acquisition techniques. The court noted that the plan, adopted in advance of a specific takeover bid, "reduce[d] the risk that, under the pressure of a takeover bid, management [would] fail to exercise reasonable judgment" and that it was therefore "even more appropriate to apply the business judgment rule" than had been the situation in *Unocal*. 500 A.2d at 1350. The court rejected as a "fallacy" the plaintiff's contention that the rights plan would deter not only two-tier offers, but virtually all hostile offers, and further upheld the evidence produced at trial that the effect upon proxy

contests would be minimal. *Id.* at 1354–55. Indeed, the board had been specifically advised that the plan would not inhibit a proxy contest. *Id.* at 1356. The court further noted that the majority of the board favoring the proposal consisted of outside independent directors who had demonstrated both good faith and reasonable investigation in adopting the plan. *Id.* Under all these facts, the court found the Household directors entitled to the benefit of the business judgment rule.

The final opinion providing guidance is *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986). In that case, Pantry Pride made a hostile tender offer for $45 per share. Lazard Freres, Revlon's investment banker, advised the Revlon directors that $45 per share was a "grossly inadequate" price, and that Pantry Pride intended to finance the acquisition through "junk bonds" followed by a break-up of Revlon which would produce a return to Pantry Pride of $60 to $70 per share. To forestall Pantry Pride from acquiring this benefit for itself, the Board adopted a Note Purchase Rights Plan. Under the plan, each Revlon stockholder received as a dividend one Note Purchase Right for each share of common stock, with the right entitling the holder to exchange one common share for a $65 principal Revlon note valued at par. The rights would become effective whenever anyone acquired beneficial ownership of 20% or more of Revlon's shares, unless the purchaser acquired all the company's stock for cash at $65 or more. In addition, the rights would not be available to the acquiror.

The rights had been redeemed by the Revlon board by the time of the Delaware court's decision and the court's observations are therefore technically dicta. Nonetheless, the Delaware Supreme Court found that the board acted "in good faith and upon reasonable investigation" in protecting the shareholders from a hostile takeover at a price below the company's intrinsic value. The court further noted that the plan, far from stopping the bidding, in fact spurred Pantry Pride to raise its bid from a low of $42 to an eventual high of $58. At p. 412. It was also apparent that the board had no entrenchment motive, since, as noted in the chancery court's opinion, Lazard Freres had advised that the probable outcome of adopting the plan would be the sale of the company. *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d 1239, 1243 (Del.Ch.1985).

Although the issue is not clear-cut, the facts of this case strongly suggest a departure from the standards of director conduct upheld in *Unocal, Household,* and *Revlon.* On March 10, 1986, the same day CTS management received plaintiff's complaint and Schedule 13D amendment (which announced the tender and proxy contest), it issued a press release stating that "CTS management has considered the information contained in the 13D amendment and does not believe that DCA's actions are in the best interest of the company and its stockholders." Although management had contacted both outside counsel and investment advisors that day to begin preparations for meeting the tender, no financial opinion on the fairness of the tender had been rendered.

As explained by CTS president, chief executive officer, and chairman Richard Hostetler, it was generally understood from the beginning that the DCA situation would be analyzed by an "internal key management group" consisting of himself, Gary Erekson (CTS Vice-President, Chief Financial Officer, and a member of the Board), Jeannine Davis (Secretary, General Counsel, and Board Member), and David Sentman, CTS Treasurer. Sentman is not a member of the Board of Directors but attended virtually all the meetings concerning the DCA tender and proxy contest. Hostetler testified in court that he spoke with counsel about the possibility of the outside directors acting independently, and was advised that, because the majority of the board (five out of eight) were outsiders, the board could act as a whole. In any event, none of the outside directors had any formal contact with CTS's counsel or

with CTS's financial advisors during this time, whereas management routinely did.

On March 11, 1986, the board met by telephone and, upon Hostetler's recommendation, agreed to retain Smith Barney as CTS's investment banker in connection with both the tender offer and the proxy contest. Smith Barney had approached Hostetler in December of 1985 to offer its services in developing an "Unsolicited Offer Preparation Program," a program which included numerous "poison pill" plans, but the Board was not advised of this fact at the meeting. Sentman and Hostetler both testified that they chose Smith Barney over Goldman Sachs, the only other investment banker with whom CTS was familiar, for reasons unrelated to the December contact.

As explained in a subsequent March 18, 1986 letter from Sentman to Smith Barney, Smith Barney's payment plan called for a different fee structure depending on the outcome of the tender and proxy fight. In particular, a special incentive payment of $75,000 over and above its baseline opinion fee would be given to Smith Barney if CTS waged a "successful proxy contest." If, however, DCA won the proxy contest, no such incentive payment would be given. In addition, Smith Barney would earn enormous transaction fees in the event that it arranged a white knight merger. Apparently, some of the outside directors at the March 11, 1986 phone meeting objected to the "incentive" structure, at least insofar as the incentives might encourage Smith Barney to arrange a merger with a third party. (Hostetler dep. at 414–415; Erekson dep. at 217–223; Kacek Dep. at 114–122). There was apparently no discussion, however, about the fact that Smith Barney's fee could increase depending on the outcome of the April 25, 1986 election of directors (Kacek Dep. at 122).

On March 12, 1986, the board met face-to-face at the offices of CTS' legal counsel. Although no financial opinion on fairness had yet been obtained or requested, the meeting was apparently devoted to discussing alternative defense strategies: a repurchase of shares by CTS on the open market, a repurchase of DCA's stock, and the adoption of a shareholder rights plan. (Hostetler Dep. at 541–550, 560–62; Erekson Dep. at 253, 259–61). Smith Barney was instructed to study all the alternatives, and was given a target date of March 17 or 18th for submitting a report presenting those alternatives. (Sentman Dep. at 396–97).

On March 13, Hostetler sent a letter to CTS shareholders to accompany the proxy statements for the upcoming April election. The letter was signed in Hostetler's capacity as chairman of the board, and advised: "We believe that [DCA's] limited tender offer, if made, is essentially a vote buying scheme to obtain control of CTS for the benefit of DCA without paying all stockholders the premium normally associated with a change of control." (Pl.App. 121). The board had not reviewed or approved the letter (Erekson Dep. at 266–268), and at least one outside director did not know it would be sent (Kacek Dep. at 222).

The next Board meeting was scheduled for March 22, 1986. On March 18th and 19th, for several hours each day, Sentman and Hostetler met with Smith Barney and with CTS's attorneys to go over the preliminary draft of the presentation, and to make specific changes. (Sentman Dep. at 450–412; Pond Dep. at 133). Watts testified in court that he knew management opposed the offer by this time. (Tr. 211). This group then concluded that Smith Barney should recommend a rights plan to the board on the 22d as among the more acceptable alternatives in responding to the DCA threat. (Sentman Dep. at 411–12). On March 19th, CTS also requested from Smith Barney, for the first time, an opinion on the fairness of DCA's tender. Although Smith Barney's engagement called for the issuance of such a letter upon Board request, there is no evidence that the Board conferred on the decision to request the opinion, and it instead appears to have been an afterthought requested by management.

Smith Barney merger and acquisition specialist Ralph Watts, the chief draftsman

and architect of the Smith Barney presentation to the Board, advised CTS on the 19th that it had not yet completed its due diligence, but stated preliminarily that the opinion would probably read "unfair from a financial point of view." The next day, Smith Barney completed its due diligence, and on Friday, March 21st, Watts drafted a letter which, after listing the various factors analyzed in general terms, baldly concludes that the "terms of the Offer are unfair to all the stockholders of CTS, other than DCA, from a financial point of view." (Pl.App. 440). Nowhere does the opinion letter state that $43 per share was an unfair price. Indeed, Watts testified that he was never asked to opine on price, and the directors testified affirmatively that the fairness of the price was never discussed (Erekson Dep. at 369–372; Pond Dep. at 141–148; Watts Dep. at 254–55; Kacek Dep. at 205–06). Unlike the presentation concerning the strategic alternatives, the opinion letter was drafted without input from CTS management. (Watts Aff.)

At the March 22 meeting, the Board met for several hours, less than fifteen minutes of which were spent on the financial unfairness of DCA's offer (Erekson Dep. at 369). The majority of the deliberations concerned the rights plan analysis which Watts had drafted (Erekson Dep. at 376). The implications of the plan were discussed, such as its effect on the capital structure of CTS if the flip-in occurred. (Erekson Dep. at 314). The desirability of adopting less stringent plans, such as flip-over plans or flip-in plans triggered only by self-dealing, was not discussed, as the Watts plan had been specifically designed with the goal of stopping the DCA offer. (Erekson Dep. at 385–86). According to the in-court testimony of Hostetler and George Frieling, an outside director, Hostetler also discussed at some length the financial effect the plan would have on DCA's tender offer: i.e., that the flip-in, if fully exercised by other shareholders, would force DCA to swallow a $24 million loss in connection with a successful tender offer for 1,000,000 shares. However, the Board nowhere considered whether that $24 million (which

was shifted to all other shareholders) bore any relation to any "excess value" (value not reflected in market price) of the company. The penalty feature of the plan appears to have been solely that—a penalty to prevent DCA's offer—and not a provision which would alternatively secure control premiums for shut-out minority shareholders.

At the conclusion of the meeting, the Board unanimously resolved that the DCA tender offer was unfair, and that the rights plan developed by Smith Barney should be adopted. A press release and letter to shareholders announcing those decisions and urging shareholders to reject the proposed tender as inadequate were sent out on Monday, March 24, 1986. By the end of the next day, the price of CTS stock dropped from 40.25 to 38, or just over five percent. (Pl.App. 271).

According to the in-court testimony of Hostetler, he considered the DCA offer to be "unfair" in that $8,000,000 ($8 times one million shares) was a small premium for DCA to pay to obtain "control" over DCA. This testimony, however, is somewhat at odds with the statements by the other directors and by Watts that price was never discussed. According to Watts, "We felt that because the offer was only for 1 million shares and not for all the shares, that that was an unfair offer." (Watts Dep. at 256). Similarly, despite the evidence that value and price were not discussed, three outside directors offered affidavits to state that DCA's offering price reflected neither CTS's "current" or "long-term" value. (Ringoen, Sommer, and Frieling Affs.). These statements are made, however, without financial data to support them. Smith Barney representative Peter Pond testified that the fairness of the tender offer was based on looking at the tender offer as the sole transaction, not considering it as a tender coupled with a proxy fight. (Pond Dep. at 141).

Notably lacking from Smith Barney's analysis and from the Board's deliberations is any attempt to estimate the company's total or long-term value for purposes of

determining whether the so-called control premium offered by DCA was reasonable. Watts testified in court that CTS was a single business and had no "bust-up" value, and that an analysis of the sort attempted in *Revlon* was therefore not called for. Hostetler affirmatively testified that he thought CTS's market price before the tender offer reflected the company's "inherent value," which would undercut his contention that the offer was at too low a premium. (Tr. at 68). Nothing more than conclusory statements support Hostetler's conclusion that the tender offer price was too low.

The deposition testimony from the directors indicates that the threat of "control" addressed by the Board was in any event not DCA's acquiring a majority interest in CTS through a series of transactions but rather DCA's pooling its votes with other CTS shareholders in the proxy contest to unseat management. According to Gary Erekson, "We didn't have much information. We had the fact that they were going to try to ... gain control of the company." (Erekson Dep. at 191). By "control" Erekson meant that DCA would win the proxy contest, and thereby dominate the Board. (*Id.*) Ralph Watts similarly testified that the plan was adopted to prevent DCA from getting "control" without negotiating a premium acceptable to management, and that "control" in this context meant voting in a slate of directors (Watts Dep. at 219–20). Watts further testified that a rights plan must not be used to deter a proxy solicitation, but he agreed that the CTS plan had precisely that effect. (*Id.* at 187–89). Outside directors Don Kacek and Ted Ross testified that they understood perfectly well that the rights plan, if it successfully defeated DCA's tender offer, would also help to defeat DCA's proxy fight (Kacek Dep. at 256–57; Ross Dep. at 114).

Several of the board members expressly stated that the threat of DCA's offer was not unfairness to shareholders but a shift in managerial policy should DCA succeed in its proxy contest. According to Ted Ross, he considered DCA's bid for control

to be a threat based on his "belief that the strategy of CTS will be changed to operate less on R&D and capital expenditures." (Ross Dep. at 82–84). Both Hostetler and Frieling voiced this concern at the hearing. This threat, however, was obviously a threat posed by the proxy contest, and the possibility that DCA's 27.7% position, along with proxies from other minority shareholders, would enable it to win the contest. The threat was not posed by the 27.7% ownership itself and no one on the Board testified to that effect.

That the Board equated the DCA threat with a shift in management may be further inferred from the lack of evidence they had about DCA's intentions to make a second-step transaction which might coerce CTS shareholders into tendering to avoid a later cashout at a lower price. Watts knew of no evidence which would have led the Board to believe that DCA was planning a two-tier offer or some kind of "squeeze-out" merger. (Watts Dep. at 216). Don Kacek said there was "no factual data" to support the threat that DCA would make an unfair merger upon taking control (Kacek Dep. at 211), and that there was just a "general fear" of such a transaction. (*Id.* at 187–88). Kacek specifically feared that a DCA controlled board might change the bylaws to permit the sale of the company without shareholder approval, but did not ask anyone, including the attorneys present, whether such a course was even possible under Indiana law. (*Id.* at 151–45).

Ross said that he never concluded DCA would attempt a two-tier tender, only that he considered such a step a "possibility." (Ross Dep. at 199). Erekson too testified to some concern that DCA could "run the company in such a way that they would eventually be able to buy the stock of the remaining shareholders at a price less than the $43" but he recalled no one from Smith Barney offering any factual basis to support this assumption. (Erekson Dep. at 303; *see also id.* at 196.) The sole information relied on by Gary Erekson to support this fear was his knowledge that DCA had

unsuccessfully attempted in the previous year to acquire Dale Electronics (Erekson Dep. at 197–98). Erekson, however, did not testify that the Board deliberated over this factor, and affirmatively testified that the subject did not come up on March 10, 1986 when management initially voiced its opposition to the offer. (*Id.*).

One further fear voiced by the CTS directors with regard to DCA's control acquisition was that DCA as a minority but controlling shareholder would have interests "likely to be different from the interests of the other CTS shareholders." (Sommer, Ringoen, and Frieling Affidavits). In particular, these directors noted that DCA had sold half of its interest earlier when CTS stock was at an all time high, and this led them to believe that DCA was "primarily opportunistic in nature." None of these witnesses offered any explanation, however, why DCA's sagacity in the stock market was harmful to shareholders. These witnesses also failed to explain why DCA's interests are likely to be "different" from other CTS shareholders except for the fact that DCA has a different managerial philosophy than that exemplified by the current CTS Board (Erekson Dep. at 366–67; Ross Dep. at 82–84, 149–50; Frieling Tr. at 187–88). However, the directors do not entirely agree on the nature of the difference and why DCA's philosophy poses a threat.

Despite the fact that the CTS Board's concern was centered on potential second stage unfairness, the Board did not discuss the adoption of a generic poison pill plan, such as the flip-over plan upheld in *Household*, which would be directed at such unfairness. Watts himself suggested that he drafted the plan he did because a generic pill would not have stopped DCA's tender altogether and therefore would not have achieved the Board's objectives. (Watts Dep. at 212–13). When asked in court how he knew what the Board's objectives were in advance of March 22, the date on which the Board officially made up its mind, Watts answered that he drafted the plan to meet the Board's objectives *if* they were to agree that the plan was unfair, in apparent contradiction to the engagement understanding which contemplated solely a variety of defensive actions. (Tr. at 209–210). The court sees this as further evidence that Watts was merely following management's desires.

Several of the directors—Hostetler, Frieling, Erekson, Sommer, and Ross in particular—either testified or swore by affidavit that the Board was concerned about a possible threat of greenmail from DCA and that part of their effort to stop the tender was directed to that goal. At least one director, however, testified that he was uncertain whether greenmail was discussed prior to the March 22 directors meeting and that, when Smith Barney presented greenmail as a possible motive, "It was determined or concluded by the board that they were really not trying to get greenmail, so that was kind of the end of the conversation." (Kacek Dep. at 153–54). Erekson also testified that repurchasing stock from DCA was "an unlikely scenario." (Erekson Dep. at 303).

Other directors testified to past knowledge of DCA which led them to the belief that DCA might, in fact, be attempting greenmail. Erekson alluded to the fact that in 1980 DCA filed suit against Unitrode in 1980 arising out of a failed acquisition attempt; the suit was settled by a buy out of DCA's Unitrode stock at a premium above market. (Erekson Dep. at 300). Erekson also alluded to knowledge that when DCA failed to acquire Dale Electronics in 1984, it brought a lawsuit alleging tortious interference with contract which was subsequently settled for $7 million. (*Id.*) There is no evidence that the Board ever discussed or analyzed these incidents, however, and Kacek's testimony emphatically indicates that whatever threat of greenmail might have been inferred was overshadowed by incidents in which DCA had rejected greenmail from CTS in the past, and had strongly objected when CTS paid greenmail to the Belzberg family. (Kacek Dep. at 155–56). The latter incident, in fact, resulted in a CTS resolution, actively supported by DCA, in which shareholder approval

was subsequently required for stock repurchases of significant amounts. Finally, Kacek indicated that he, if not the Board, considered a greenmail threat to be at odds with DCA's stated objective of waging a proxy fight: "We felt that DCA really was attempting to do what they said they were attempting to do, and that was take over the board and control the board of the company." (*Id.* at 155).

Because DCA has been a shareholder of CTS since 1980, the court has considered whether the history between the parties would legitimate an otherwise unexamined decision to oppose DCA's tender. That history reveals that the two companies have had antagonistic relations since CTS in 1980 filed both state administrative and federal judicial proceedings to enjoin DCA from making further acquisitions of its stock. DCA in response filed a lawsuit to have the state business takeovers act held unconstitutional. CTS filed a counterclaim, which was subsequently amended to include a claim for illegal "short-swing" trading in violation of § 16(b) of the Securities Exchange Act of 1934. The state administrative proceedings were resolved in DCA's favor, and on June 11, 1985, the parties settled the remaining suits by stipulation with DCA paying CTS $215,000 on the § 16(b) counterclaim.

The record also reveals that on June 4, 1981, DCA filed a lawsuit to request inspection of CTS corporate documents. The trial judge found that DCA failed to give CTS a reasonable time to comply with the requests and lacked a "proper purpose" in seeking inspection. These findings were upheld on appeal. *Dynamics Corp. of America v. CTS Corp.*, 479 N.E.2d 1352, 1355 (Ind.App.1985).

DCA has differed with CTS management on numerous issues regarding CTS welfare, and CTS management has viewed DCA's attempts to influence or criticize them as harassment. The most important of these events was DCA's objection in 1983 to CTS's proposed acquisition of Micro Peripherals Incorporated ("MPI"), a floppy disk drive manufacturer. The acquisition

was not successful, and CTS abandoned the business in 1984 at a significant loss.

Based on this history, it would appear that the CTS Board had some background for distrusting DCA and for questioning its motives; indeed, had the Board not done so, it would have been derelict in its duties. The court sees nothing in the history of the relationship which imports a clear threat to CTS shareholders, with the possible exception of the § 16(b) violation. What is important, however, is that the Board members never focused on this history or particular aspects of it as a ground for opposition: the rationales for distrusting DCA were distinct, not unanimous, and did not appear to be the result of informed decisionmaking.

Based on all of the foregoing facts, the court finds that DCA has shown a probability of success sufficient to satisfy the standards for preliminary injunctive relief. There are three possible routes by which DCA would prevail at a trial on the merits: 1) by showing that the primary purpose of the CTS Board in proposing the rights plan was to entrench themselves; 2) by showing that the Board did not act with good faith and reasonable investigation; and 3) by demonstrating that the defensive mechanism was not "reasonable in relation to the threat posed." *Unocal,* 493 A.2d at 955. DCA has presented evidence which would show a chance for success on the first two of these grounds, and has presented evidence which would show a strong likelihood of prevailing on the third. The court will briefly discuss each issue in turn.

*Entrenchment Purpose.* DCA has shown no direct evidence of an entrenchment purpose on the part of CTS's management. However, the evidence does show that management decided almost immediately to oppose the tender offer, and that it considered the threat to be intimately intertwined with that of a proxy contest. Despite the time spent by the board in reviewing alternative strategies, the nature of the threat posed by DCA and the issue of what would pose a reasonable response were ut-

terly ignored. The alternatives were instead all directed toward the end of stopping the tender offer and winning the proxy fight at all costs. The court is cognizant that where the majority of a Board of Directors are independent, the Board's actions are entitled to a presumption of validity. *Household,* 500 A.2d at 1356. But that presumption is limited to directors who have displayed "reasonable grounds" for believing in a danger to corporate policy, and serious questions exist in this case as to the reasonableness of the directors' motives.

Under these circumstances, there is a reasonable possibility that further evidence might reveal some of the board's stated concerns to be sham. Hostetler was less than candid in his in-court testimony when he stated that as of March 10th he had not decided to oppose DCA's offer, and as a director maintained an open mind. Watts's in-court testimony confirmed the impression that Smith Barney drafted the rights plan in light of an early management determination to stop the DCA tender at all costs, not to simply stop second stage unfairness.

This impression is furthered by the fact that the flip-in plan developed in March has a lower acquisition level (15%) for triggering the right than any plan recommended by Watts to CTS in December, or any other plan known to have been adopted, according to Watts' in-court testimony. (Tr. 200). The president of DCA testified at the hearing that mounting a proxy contest from a 15% base was difficult. (Tr. 60–61). The court cannot imagine that this lower threshold was not designed with the proxy contest in mind. DCA has thus made a "better than negligible" case for success on the merits as to its claims of entrenchment purpose which could support injunctive relief if other requirements are met. *Omega Satellite Products Co. v. Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982).

*Good Faith and Reasonable Investigation.* The testimony of the various board members concerning the actual threat posed by DCA appears to be in conflict. This conflicting testimony suggests one of two things—either some of the testimony is unreliable or the board simply failed to discuss the matter thoroughly and reasonably, thus leaving individual directors with different impressions of what was decided and resolved. These conflicts, coupled with the fact that the outside directors passively observed while management actively participated in shaping CTS's response to the tender, suggest numerous factual disputes as to whether the directors' investigation was reasonable as a matter of law.

Under *Household,* however, the standard for determining whether a board exercises informed business judgment is governed by a standard of "gross negligence." 500 A.2d at 1356. This standard is presumably higher than a standard of mere unreasonableness, and the court cannot point to a decided probability of success in DCA's favor. Much of Hostetler's and Watts's testimony depended on the concept that *any* partial tender offer is inherently unfair, without regard to the tender offer price. The Board accepted this characterization without much analysis, and the outside directors followed management's lead with little effort at exercising independent judgment. On the other hand, the Board did not adopt the rights plan until retaining both legal and investment advice. Thus, while there is evidence that little true investigation occurred, a showing of gross negligence has not been established at this juncture.

*Reasonable Relation to the Threat Posed.* The court finally finds that the CTS directors have not shown that the rights plan was a reasonable response to the perceived threat of a DCA takeover. The directors were apparently instructed on this point by legal counsel, and were informed by Watts that the plan was an "appropriate" response to the DCA tender offer. (Erekson Dep. at 385). The only definition of "appropriate" which can be gleaned from the testimony, however, appears to be whatever it took to prevent the tender. Thus, the CTS directors appear to argue that once they decided the DCA of-

fer represented a "threat," any response which eliminated that threat was a "reasonable" one.

The court does not understand the Delaware cases to support this argument. The flip-in provision in *Revlon* was based on an evaluation of the company's "true value," and was expressly designed to prevent a minority shareholder from using company assets to finance its acquisition and reap a large profit not fairly shared with minority shareholders. The effect of the plan was to set a fair price for the stock; no additional equity was involved.

Similarly, the rights plan in *Moran* was directly addressed to the problem of a controlling shareholder who might use a twostep merger to dilute the value of minority shareholders' investment in a merger. The court specifically concluded that the plan would not deter all hostile offers, but only coercive offers. 500 A.2d at 1354. The court further determined that the plan would not affect proxy contests. *Id.* at 1355. As in *Revlon*, the plan was tailored to the goal of preserving value for minority shareholders in the event of a takeover without specific regard to entrenchment.

Here, by contrast, the Board adopted the plan knowing that it would strengthen management in an ongoing proxy contest. Although CTS suggests that 15% is little different from 20% in terms of a proxy contest, that argument ignores the fact that the Household Board was specifically advised that the plan would not affect proxy fights, and the court found sufficient evidence to support that statement for purposes of the business judgment rule. Here, by contrast, the CTS directors understood that the rights plan would hamper DCA's proxy solicitation and battle.

The court does note that Smith Barney's presentation lists as a "disadvantage" of the rights plan the fact that it would not deter proxy solicitation. (Pl.App. 354). This statement was apparently added by Sentman at the March 18th–19th drafting sessions. (Sentman Dep. at 410). The court sees the evidence as both helping and hurting defendants. Had the Board members specifically relied on this statement, the issue of reasonableness or at least motive might be different. The evidence suggests, however, that the Board did view the rights plan as a hindrance to DCA's proxy contest. Management's insertion of this statement also suggests that deterring proxy solicitations itself was a purpose of the directors at the March 22 meeting, despite the indications from *Household* that such a purpose is not a legitimate goal in enacting a defensive mechanism against hostile acquisitions.

The evidence also suggests that the plan would deter *all* hostile acquisitions, not merely coercive ones. In the words of one director, the intention was "to deter someone/anyone from acquiring 15 percent." (Kacek Dep. at 243–45). The plan did not set a price above which offers could be deemed fair. (Watts Dep. at 176–77). The flip-in features of the plan appear to have been set so as to deter *all* partial offers. The directors never analyzed whether there was "excess value" in the company which would allow an acquiror to absorb the economic loss, nor requested such information. Finally, in contrast to the situation in *Revlon*, the plan did not spur a bidding contest but in fact depressed the market for CTS's stock.

This court does not hold that all flip-in plans which inflict a penalty based on mere ownership, or even ownership levels as low as 15%, are thereby invalid. This court only holds, for purposes of a preliminary injunction, that such a flip-in plan, adopted in the heat of a proxy contest, with no identifiable threat other than the vague fears articulated here, is unreasonable in relation to the particular threat posed. This is especially true considering the fact that DCA's nominees, as directors, would be subject to high standards of fiduciary duty and would have to prove the fairness of any dealings between CTS and DCA. Thus, plaintiff has met its burden of showing probable success on the merits for purposes of injunctive relief.

Because plaintiff has shown a strong likelihood of success, the court examines

whether the other requirements for injunctive relief have been met. The 1986 Annual Shareholders Meeting is set for April 25th, just one week away, and other courts have concluded without much difficulty that if a tender offer is defeated due to illegal defensive tactics, the offeror will suffer irreparable harm to its rights of corporate suffrage. *See e.g., Minstar Acquiring Corp. v. AMF Inc.*, 621 F.Supp. 1252, 1257 (S.D.N.Y.1985). The court finds that DCA would similarly suffer irreparable harm if it is not allowed to purchase its shares unencumbered by unreasonable management defenses.

The court also finds that the harm to the plaintiff, if the injunction were denied, would outweigh the harm to CTS from granting an injunction. CTS argues that an injunction against the rights plan would increase the chances of a change in corporate control without a fair premium. The court disagrees. The chief effect of an injunction would be to restore the parties to the "level playing field" of corporate suffrage in which shareholders, not management, may determine who will run CTS. Second, the injunction would not prevent the CTS Board from adopting more limited measures to protect against the threat of future selfdealing by DCA should it successfully unseat current management. The court therefore finds that the harm to CTS is decidedly less than the harm to DCA.

Finally, the court finds that an injunction would not harm the public interest. As Congress noted in passing the Williams Act, "takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967), cited in *Edgar v. MITE Corp.*, 457 U.S. 624, 629, 102 S.Ct. 2629, 2633, 73 L.Ed.2d 269 (1982). To enjoin defendants' shareholder rights plan would enable DCA's tender offer bid to go forward consistent with what Congress has found to be in the public interest.

Accordingly, the court grants DCA's motion for preliminary injunction. Defendant CTS is hereby enjoined from enforcing its Shareholder Rights Plan upon DCA's acquisition of a 15% interest in CTS. The clerk is directed to prepare the matter for expedited appeal.

It is so ordered.