DYNAMICS CORPORATION OF
AMERICA, Plaintiff,

v.

CTS CORPORATION, Robert D. Hostetler, Gary B. Erekson, Joseph DiGirolamo, George F. Sommer, Gerald H. Frieling, Jr., Don J. Kacek, Ted Ross, and Richard M. Ringoen, Defendants.

No. 86 C 1624.

United States District Court,
N.D. Illinois, E.D.

May 3, 1986.

Lowell E. Sachnoff, William N. Weaver, Jr., Dean A. Dickie, Sarah R. Wolff, Thomas J. Bamonte, Sachnoff Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff Dynamics Corp.

Timothy A. Nelsen, Mark T. Carberry, Christina M. Tchen, Skadden, Arps, Slate, Meagher & Flom, Chicago, Ill., for Outside Director defendants Sommer, Frieling, Kacek, Ross & Ringoen.

Stephen Sandels, Gary Prior, McDermott Will & Emery, Chicago, Ill., for CTS Corp., Hostetler, DiGirolamo & Erekson.

### MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This action under Section 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), is before the court on the motion of plaintiff Dynamics Corporation of America ("DCA") for injunctive relief with regard to a Shareholder Rights Plan adopted by defendant CTS Corporation on April 23, 1986 as part of a white knight strategy for selling CTS. This white knight strategy and rights plan were adopted in response to this court's memorandum opinion and order of April 17, 1986, in which I preliminarily enjoined the operation of an earlier rights plan on breach of fiduciary duty grounds. DCA alleges that the actions of the CTS Board in adopting the white knight strategy and Second Rights Plan also constitute a breach of the directors' fiduciary duties

to CTS and its shareholders, and moves for injunctive relief against the plan. For the reasons set forth herein, the motion is denied.

The legal standards governing this decision are set forth in this court's April 17, 1986 Memorandum Opinion and Order ("Opinion") 637 F.Supp. 406, and will be briefly summarized here. Under Delaware law, which the courts of Indiana appear to follow, a corporate board of directors which adopts defensive mechanisms in response to a takeover threat is recognized to be acting under a conflict of interest which calls for some enhanced judicial examination if their actions are challenged in court. Thus, the directors are under an initial burden to show that they exercised good faith and reasonable investigation in determining whether a danger to corporate policy exists, and to show that the defensive mechanism was reasonable in relation to the threat posed. Once the directors satisfy this burden, however, their actions are entitled to the presumptions of the business judgment rule, and a shareholder who challenges their actions must show that the primary purpose of the defensive mechanism was entrenchment. *See generally* Opinion, pp. 409–411, and 416.

On March 10, 1986, DCA announced an intention to make a partial tender offer for up to 1,000,000 shares of CTS shares and to wage a proxy contest for control of the CTS Board. On March 22, 1986, CTS adopted an "acquisition flip-in" shareholder rights plan for the admitted purpose of defeating DCA's offer. On April 17, 1986, I held that DCA had shown a strong probability of success on its claims that defendants breached their fiduciary duties under Delaware law when they adopted the plan. The chief factors guiding my decision were: that the plan would have effectively insulated CTS from all hostile takeover bids, appeared to have been expressly designed to defeat DCA's ongoing proxy contest without much consideration for the fairness of the offer itself, and was adopted largely at management's behest without independent investigation from the outside directors.

In response to that decision, the CTS Board, while pursuing an expedited appeal, began a series of meetings to discuss the ramifications of this court's opinion and what they perceived as the "continuing need to protect CTS stockholders from the possible negative effects of a two-tier transaction" and "the wide range of self-dealing transactions" which they feared would take place if DCA successfully took control over the CTS board of directors. (Minutes of CTS Board Meeting, April 19th, at Pl.App. 59). At the first of these meetings, held April 19th, the directors noted this court's acknowledgment that lesser defensive measures might be permissible and reviewed with investment advisor Ralph Watts of Smith Barney Harris Upham & Co., Inc., three different types of shareholder rights plans: a flip-over plan to deter partial tender offers made with a view to a second step transaction in which the offeror acquires the whole company; a self-dealing flip-in plan; and an equity flip-in plan modeled after the one approved in dicta by the Delaware Supreme Court in the case of *Revlon v. MacAndrews & Forbes, Inc.*, 506 A.2d 173 (Del. Supreme Court 1986).

The outside directors decided to meet separately, again presumably in response to this court's earlier opinion, and resolved to obtain separate counsel. The next day, April 20th, the Board resolved to form a special committee of outside directors for purposes of analyzing the situation, hired Skadden, Arps, Slate, Meagher & Flom as counsel, and discussed both a self-dealing flip-in plan and a *Revlon* type flip-in plan. The Special Committee recognized that the latter plan would require "financial analysis of the shareholder value to be realized." (Minutes April 20, 1986, Meeting, Pl. App. 63). The special committee also authorized the attorneys for both CTS and the outside directors to explore settlement possibilities with DCA's counsel, such as a stock repurchase or compromise slate of directors.

On the evening of April 20, the special committee met with it separate counsel for

four hours to review generally its responsibilities with regard to DCA's tender offer and the options available to CTS. The committee met again on April 22 for several hours with counsel and representatives of Smith Barney. The committee looked at what Smith Barney termed the "blended value" of DCA's partial tender offer, i.e., the $43 tender price for 18% of CTS shares coupled with a $35 market price for the remaining shares, and concluded that the tender offer was financially inadequate. The committee then reiterated concerns, voiced in the adoption of the earlier rights plan, that DCA "might" take steps following completion of its partial tender that would result in a diminution of shareholder value to minority shareholders. The committee was also advised by Smith Barney that an acquisition by DCA of stock in excess of 27.7% (its ownership after the tender was completed) could constitute a "blocking position" which would jeopardize the ability of all CTS shareholders to receive a premium in a sale of the company. (Ross Aff.).

By this time, the committee was advised that settlement possibilities with DCA were exhausted. (Kacek Dep. 313–14, 430–31). Under these circumstances, the committee determined that shareholders other than DCA would be likely to maximize the value of their shares by a sale of the entire company at the highest possible price through an orderly auction. In conjunction with such a goal, the committee decided to adopt a "back end" shareholder rights plan tailored to limit DCA's holdings to under 28%, sufficient for the special committee to attempt a sale, but (at least purportedly) designed not to interfere with DCA's proxy solicitation and not to have the characteristics criticized by this court.

On April 23, 1986, the same morning that the expedited appeal was being argued before the Seventh Circuit, the Board met again. The committee recommended to the Board of Directors that the above plan be implemented and that the portion of the appeal relating to the original rights plan be withdrawn. The full Board agreed. However, that afternoon the court of appeals affirmed this court's decision in an unpublished order with a written opinion to follow in due course, thus mooting the withdrawal issue. (Minutes April 23 meeting; Ross. Aff.).

Under the new shareholder rights plan each CTS shareholder receives a dividend of a right to exchange shares of CTS stock for one-year notes with a principal amount of $50 and bearing interest at 10% per annum. The rights become exercisable and trade separately from CTS common stock only if a person or group acquires beneficial ownership of 28% or more of CTS common stock, and will be distributed to all CTS shareholders other than the acquiror five days after the date of the triggering event. Distribution of the rights will be postponed for 120 days if an acquiring person purchases 28% pursuant to a publicly announced intention to buy all outstanding CTS shares for $50 or more in cash, and the rights are completely extinguished if such a sale is completed within the time frame set forth in the plan. At any time prior to the distribution event or a fully negotiated sale, the company may redeem the rights for $.05 per share.

Two questions are presently before the court. One concerns whether the press release and proxy statement announcing the proposed sale of the company and the rights plan were materially misleading; the other is whether the rights plan itself should be enjoined. Only the latter issue is addressed in this opinion. DCA has argued that the decision to sell is a breach of fiduciary duty given the Board's earlier determination that now is not a propitious time for selling CTS, that the strategy was designed to win the proxy contest and maintain control, that the Board acted on uninformed assumptions, and that neither the decision to sell nor the rights plan is a reasonable response to the threat posed. For the reasons set forth herein, the court concludes that while DCA has shown fair ground for litigation, its probability of success on these claims is decidedly lower than was true in connection with the earlier rights plan, and that the balance of hard-

ships does not weigh sufficiently in DCA's favor to justify injunctive relief.

As noted earlier, it is the directors' initial burden to show that they acted with good faith and reasonable investigation, and that the defensive mechanism adopted was reasonable in relation to the threat posed. Thus, to show a "probability of success" sufficient for preliminary relief, DCA must show that the directors have not met their burdens under the above standard. Alternatively, DCA may show that the plan is invalid as a device the primary purpose of which was entrenchment. The court discusses these standards in turn.

**Good Faith and Reasonable Investigation.**

■ In my April 17 opinion, I found serious questions about the reasonableness of the directors' investigation in opposing DCA's partial tender offer and adopting an acquisition flip-in rights plan, but I also concluded that the evidence did not rise to the level of "gross negligence" as seemingly required under *Moran v. Household, International, Inc.*, 500 A.2d 1346, 1356 (Del.1985). *See* Opinion at p. 417. The basic factual dispute before this court at the present time is whether the CTS board's actions subsequent to my opinion indicate an honest attempt to correct the inadequacies of their earlier responses, or a single-minded continued effort at stopping DCA's proxy contest despite this court's conclusions.

The evidence, while not unequivocal, strongly supports the former of these two theories. The record shows a much greater thoroughness of discussion and informed decision making than was presented to the court on the earlier motion. The directors appointed a special committee of outside directors to analyze the situation in order to minimize the conflict of interest, the outside directors obtained separate counsel, and the board required further investment and legal advice before taking any firm actions. The directors also studied my opinion carefully, and expressly attempted to avoid the pitfalls of directly hampering DCA's proxy contest or interfering with DCA's already existent partial tender offer.

DCA argues that the decision to sell is nonetheless a breach of fiduciary duty given the earlier unequivocal view of the CTS Board in March that now is an inopportune time to sell the company, and the admission of director Don Kacek and investment advisor Ralph Watts that nothing has changed in CTS's business performance to warrant a different conclusion. The court agreed at a status hearing last week that this sudden shift in attitude required some explanation from the CTS directors, and the parties conducted limited discovery directed to the issue. Based on this new evidence, the court finds that defendants have met their burden of showing that the shift was an informed decision.

The directors whose depositions or affidavits are in evidence have stated that their change in position regarding a sale of the company was due to perceptions about CTS's marketability now that DCA owns approximately 27.7% of the company, their concern that minority shareholders would lose a valuable control premium if DCA attempted a second-step transaction, and their belief that CTS's long-term value might not be realized if DCA were to discontinue certain capital and research expenditures. These concerns were discussed at some length with both legal and investment advisors. These directors thus have not taken the position that now has suddenly become a good time to sell CTS, only that a sale is the lesser of two evils.

DCA argues that the decision is nonetheless uninformed because the whole idea of DCA posing a "threat" or "evil" to be avoided is without factual support. Specifically, DCA argues that the Board's decision to sell is based on the uninformed assumption that the presence of a sizeable minority shareholder ipso facto inhibits the sale of a public company, and based again on the general fears that DCA, upon acquiring control, might attempt a second-step transaction which would squeeze out minority shareholders at less than fair value.

The court agrees that both fears are general, not specific. While Watts informed the Board that the sale of CTS to a third-party would become less likely if DCA increased its holdings over 27.7%, he did not provide detailed analysis or specific examples of why this was so. (Watts Dep. at 603–04; Kacek Dep. 350–53). Similarly, there is no factual data to support the fear that a 28% or greater shareholder would be able to block such a sale, since the sale of a company requires only majority shareholder approval under Indiana law. However, that the fear is general rather than specific does not render it wholly without substance. The basic premise of Watts's advice appears to be that a sizeable minority shareholder who wants to resist a sale of the company can do so by making a contrary bid at a higher price for the shares which would give it blocking power, and that would-be acquirors might be inhibited by this prospect. Such a premise, despite its convenience to a board of directors faced with a takeover challenge, is a rational assumption from which the board may conclude that many CTS shareholders would be better off with a present sale rather than with DCA exercising managerial control through a sizeable minority position. Indeed, Watts's opinion on the "threat" of a 27.5% shareholder was confirmed by financial consultant Raymond Troubh after this round of litigation began. The court will not second-guess Watts's advice in this regard.

There is, of course, no evidence that DCA would itself act in such a way were it to obtain control of the CTS Board, and indeed fiduciary principles might readily prevent DCA from so acting. As I noted in my earlier opinion, CTS's fears that DCA might attempt an unfair self-dealing transaction are largely conjectural. Opinion at pp. 414–415. That the fears are conjectural, however, does not mean that the CTS Board must simply respond with passivity, but instead merely limits the scope of what is reasonable in response. *Cf. Opinion* at 415 (while Board in March expressed concerns over second stage unfairness, failure to discuss a plan directed at the unfairness and not the initial acquisition raised questions over the validity of the plan adopted). Certainly, DCA has not fully disclaimed the possibility of a future merger, and the CTS directors therefore may reasonably conclude that a present sale of the company as a whole would maximize shareholder welfare.

The evidence further suggests that, once the decision to sell was reached, the special committee of outside directors acted reasonably and in good faith in adopting the present rights plan as an adjunct to the sale. The plan was modeled on that upheld in dicta by the Delaware Supreme Court in *Revlon,* the Board ordered a financial evaluation from Smith Barney as to what would be a proper exercise price for the plan, adopted a figure of $50 to represent the high end of realizable value over a one-year period, as is apparently typical for such plans, and, pursuant to this court's suggestion, requested second opinions from Merrill Lynch and Raymond S. Troubh, a former Lazard Freres partner, as to the propriety of Smith Barney's evaluation. Both opinions reaffirmed the reasonableness of Smith Barney's work. This evidence satisfies the reasonable investigation required under *Household.*

This is not to say or suggest in any way that the Board's perception of DCA as attempting to acquire CTS "on the cheap" is correct. Smith Barney's opinion on the financial inadequacy of DCA's tender offer suggests a certain sophistry by assuming that the total control premium for a partial acquisition should be matched against the premium for a 100% acquisition, without regard for the fact that the partial acquiror obtains only the right to exercise managerial control, not the right to keep all profits for itself. Such a premise would appear to make sense only where the acquiror would afterwards be able to purchase the remaining shares at market price, but there is no evidence that DCA either intends to or will be able to do this. Nonetheless, given that DCA has never fully disclaimed the possibility of a second-step merger, management is entitled under state law to take

certain steps against that possibility without the fear of being second-guessed by a court so long as the steps taken are reasonable ones. The court therefore turns to that inquiry.

**Reasonable Relation to the Threat Posed.**

DCA argues that, even if there exists a reasonable basis for perceiving a threat to the shareholders of CTS, sale of the company now and adoption of a shareholder rights plan is an unreasonable response. In support of this argument, DCA points out that the Board could have established a rights plan to prevent unfairness or self-dealing, or a flip-over plan like that in *Household*, and that although such plans were discussed on April 19th in general terms, the Board never explored the specifics of them. (Kacek Dep. at 460–61). DCA also points out that other measures, such as submitting protective measures to a shareholder vote at the upcoming meeting, were never explored.

■ Clearly, the white knight strategy challenged here was not the most reasonable response CTS could have adopted to address its concerns of future unfairness. Either a flip-over plan like that adopted in *Household* or a self-dealing flip-in which could not be redeemed by a DCA dominated board on its own power would have achieved the desired results. But the court does not understand the directors' burden under *Household* to show that their plan was the *most* reasonable response possible, only that it was *a* reasonable response. Unlike the above strategies, the current plan was directly responsive to the Board's perception that CTS shareholders would lose certain value if DCA were to win its proxy solicitation, particularly if DCA were to acquire more than 28%. The white knight strategy was also the only one of the defensive steps considered which would not impede with DCA's ability to acquire the full 1,000,000 shares it had tendered for in March.

DCA argues that the plan is unreasonable because it violates important public interests by giving management a potent weapon against unfriendly tender offers.

The court considers this argument foreclosed by dicta in *Revlon*. In that case the Delaware Supreme Court assumed that, like the flip-over plan in *Household*, a back-end plan would merely start an orderly bidding process for the company, and would not deter all hostile offers. Indeed, because the CTS rights expressly expire upon a tender for $50 or more in cash, the plan cannot be said to insulate management from all hostile offers as was true of the acquisition flip-in plan adopted in March. The actual prospects of a sale of CTS at $50 or more is discussed in the court's related opinion on DCA's proxy violation motion.

DCA argues that the *Revlon* case concerned an offeror bent on a bust-up takeover financed by junk bonds, and that the extremeness of the plan was therefore justified by the threat of a shareholder selling off company assets to finance its acquisition after the fact. Since no such threat is present here, as this court found on April 17th, DCA argues that *Revlon* provides no justification for adopting such a plan here.

■ The court disagrees. Once a board of directors decides to sell the company, they have a duty to insure that shareholders receive maximum value. Any rights plan which aims to insure an orderly auction of the company is therefore a reasonable response. *Revlon*, at 182 & 184 n. 16. In the court's view the rights plan must stand or fall with the white knight strategy generally. While DCA has raised some colorable arguments regarding the decision to sell, it has demonstrated at best a minimal probability of success on that issue, and injunctive relief against the plan cannot issue unless the balance of harms distinctly favors DCA.

The court finally notes that the potential debt issuance under the new rights plan, while high in relation to CTS's present loan agreements, is reasonable in view of the limited likelihood that the full debt would ever issue and the ability of CTS to renegotiate its current loan agreements and to substitute secured for unsecured debt.

The information provided by defendants therefore satisfies the court's concerns on this issue as expressed last week. The adequacy of the disclosures of the debt limitations under CTS's loan agreements and Indiana law is discussed in the opinion on DCA's motion on the proxy violations.

**Entrenchment or Improper Motive.**

■ Even though the CTS directors have, as a preliminary matter, met their burdens of demonstrating entitlement to the business judgment rule, DCA could still obtain injunctive relief could it show that the rights plan was adopted primarily for entrenchment purposes, or for other self-interested reasons. DCA argues that two such motives can be perceived in the present situation: 1) that the plan was designed primarily to win the proxy contest; and 2) that the directors acted to protect themselves against a perceived threat of personal liability for consequences stemming from the adoption of previous defensive measures. The court discusses these issues in turn.

The CTS directors recognized that one consequence of the white knight strategy was that shareholders who were interested in cashing out would probably vote for current management in the upcoming proxy contest, and that this prospect materially enhanced their possibility of being reelected to the Board. (Watts Dep. at 363–65; 439; Ross Handwritten Notes App. 85–90). However, the Board further appeared to have recognized that the maintenance of control would in any event be temporary, since the auction process is in fact underway, and DCA has shown no evidence which persuades me that the Board might be using the white knight strategy as a mere "ploy" to get reelected. The Board is committed to a sale of the company.

The court notes that entrenchment cannot be ruled out as a possible motive; the white knight eventually chosen may want to retain current management and Smith Barney has included in its white knight list foreign acquirors who in my experience are more likely to follow that route. But what is important for present purposes is that there is no direct evidence that golden parachutes or other terms which promote entrenchment are being discussed at the present time. DCA has thus not shown a probability of proving at a full trial on the merits that defendants are currently motivated by a desire to retain control. That the defendants are determined to stop DCA is evident, as they consider it better to sell CTS at a potentially depressed price than watch DCA take control. But this hostility towards DCA, even if unreasonable, cannot be simply equated with a goal of entrenchment.

DCA also maintains that the directors acted to minimize their potential liability. As noted in *Revlon,* when a board ends a bidding war for a company in a manner which protects the directors against a threat of personal liability, their action cannot withstand the enhanced scrutiny which *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946 (Del.Supr.1985), requires of director conduct. *Revlon,* at 184–185. The deposition excerpts cited to support this theory of the defendants' actions are weak, however. According to Watts, the concern over personal liability was directed to what would happen if the rights under the new plan became triggered, not with respect to liability for their earlier actions. (Watts Dep. at 496–97). Kacek admitted that he views it likely that he will be sued for his earlier acts, particularly since DCA has recently announced such an intention, but nowhere testified that such liabilities were discussed by the Board generally. Such a suit by other shareholders is in any event unlikely because the rights plan did not actually prevent the tender offer. Finally, the plan does not directly protect the directors from the personal consequences of their earlier defensive policies, as was apparent in the *Revlon* case. Thus, the court finds that there is insufficient evidence of improper motive which could justify injunctive relief against the rights plan.

**Balance of Hardships and Irreparable Harm.**

■ Although DCA has not shown a probability of success on its claims of fidu-

ciary breach, DCA has raised some serious questions concerning the reasonableness of the directors' decision to sell which make it advisable, in my view, to analyze whether the balance of harms so clearly favors DCA that injunctive relief should nonetheless be granted. DCA argues that it will be irreparably harmed if defendants are allowed to use the new rights plan to prevent DCA from acquiring additional shares before the annual meeting. DCA has no unrestricted right to acquire control of CTS to the exclusion of others, however. The plan does not limit DCA to an equity position so low as to render impossible a successful proxy solicitation, and does not interfere with an *ongoing* tender offer as was true of the prior rights plan. Indeed, while DCA has all along reserved the right to purchase additional shares over the 1,000,000 figure, DCA's president Andrew Lozyniak testified that he considered the 1,000,000 figure to be the appropriate purchase for making a successful proxy bid. DCA (at least according to its present brief) could have expanded its tender offer to purchase over 1,000,000 shares but chose not to do so at that time.

The adoption of illegal defensive tactics in response to a threat of a change in corporate control nonetheless implicates irreparable rights of corporate suffrage, and DCA has shown some basis for alleging irreparable harm. In this case, however, the irreparable harm is slight. DCA, if elected to the Board, can redeem the rights. The chief effect of the plan is to change the terms on which the upcoming proxy fight will be waged. No longer will shareholders look to who will better manage the company, but they will decide whether or not they want to see the company sold in the next year. While the current Board may have had some self-serving motives in so shifting the terms of debate, the ultimate sale decision is one for the shareholders of CTS to decide. To enjoin the rights plan would be to remove that decision from the shareholders and guarantee DCA success. This court's role, however, is only to ensure a fair fight, and the chief ways in which the plan unfairly impedes

the proxy fight can be cured through the corrective disclosures ordered in my separate opinion.

### Conclusion

For the reasons stated above, this court will not enjoin the current shareholder rights plan of CTS. To do so would be to engage in too much second-guessing of the Board's business decisions which were apparently adopted in good faith and with the aim of correcting processes earlier found inadequate. The court does not hold that such a rights plan is valid in all circumstances, or that any sale pursuant to the current white knight strategy must be upheld as an exercise of business judgment.

Accordingly, DCA's motion for preliminary injunctive relief against the operation of CTS's current shareholder rights plan is denied.

It is so ordered.