DESERT PARTNERS, L.P., a Texas limited partnership, Desert Acquisition, Inc., a Texas corporation, and Morris M. Cottle, individually, as class representative, and derivatively, Plaintiffs,

v.

USG CORPORATION, a Delaware corporation, and Archie R. Boe, Worley H. Clark, James C. Cotting, James W. Cozad, Robert J. Day, David W. Fox, Philip C. Jackson, Jr., Ralph C. Joynes, Eugene Miller, Graham J. Morgan, Jack David Sparks, Thomas M. Thompson, Alan G. Turner, William L. Weiss and William J. White, Defendants.

Nos. 87C9399, 87C9455 and 88C1813.

United States District Court,
N.D. Illinois, E.D.

April 28, 1988.

Frederic F. Brace, Jr., Ellen A. Rubel, Chicago, Ill., Stephen C. Neal, P.C., Emily Nicklin, Kevin T. Van Wart, Kirkland & Ellis, Chicago, Ill., for Morris M. Cottle.

Don H. Reuben, John R. McCambridge, Isham, Lincoln & Beale, Chicago, Ill., Robert S. Rifkind, Douglas D. Broadwater, Cravath, Swaine & Moore, New York City, for defendants pro hac vice.

## MEMORANDUM OPINION AND ORDER

HOLDERMAN, District Judge:

Plaintiffs Desert Partners, L.P., Desert Partners Acquisition, Inc. (collectively "Desert Partners"), and Morris M. Cottle [1] bring this motion for preliminary injunction against defendant USG Corporation ("USG") and its Board of Directors.[2] Desert Partners requests the court to enjoin USG from implementing its poison pill. For the following reasons, the motions for preliminary injunction are DENIED.

## BACKGROUND [3]

USG Corporation is a publicly held Delaware corporation with its executive offices and principal place of business in Chicago, Illinois. USG is a diversified manufacturer of building materials. According to Michael J. Zimmerman of Salomon Brothers, Inc., USG's financial advisor, USG has enjoyed a relatively prosperous existence over the past decade. Its growth rate in earnings per share ranks fourteenth among all Fortune 500 companies. (Zimmerman

---

**1.** Mr. Cottle is a USG shareholder who brings this motion on behalf of himself, as a class representative, and in a derivative capacity.

**2.** USG's Board of Directors includes: Archie R. Boe, W.H. Clark, James C. Cotting, James W. Cozad, Robert J. Day, David W. Fox, Philip C. Jackson, Jr., Ralph C. Joynes, Eugene Miller, Graham J. Morgan, Jack D. Sparks, T.M. Thompson, Alan G. Turner, W.L. Weiss, and William J. White.

**3.** The parties have waived a hearing on the preliminary injunction.

Aff. ¶ 2). The 1987 Fortune Magazine Directory ranked USG seventh among Fortune 500 companies in return on stockholder's equity. *Id.* Moreover, USG stockholders have benefited from USG's performance. Over the past five years, the price of the company's shares on the New York Stock Exchange appreciated approximately 191 percent. In contrast, the S & P 500 average increased only 50 percent. *Id.*

Despite its prosperity, Mr. Zimmerman indicates that the price of USG stock "has not always reflected the true value of the company." (Zimmerman Aff. ¶ 3). As a result, USG's management has adopted a number of defensive strategies to minimize the likelihood that USG will fall prey to a hostile takeover or some other attempt to gain control of the company.[4] In this motion, Desert Partners challenges USG's use of its Preferred Share Purchase Rights Plan, or "poison pill," which the Board adopted on March 20, 1986.

USG's poison pill enables the Board to create and distribute one "Right" for each share of USG common stock. Under the terms of the Plan, ten days after an entity 1) acquires 20 percent or more of USG's shares or 2) announces an offer to acquire 30 percent or more of USG's shares, the Rights become exercisable and the holder of each Right may purchase 1/10 of a share of preferred stock for $200. The "poisonous" effect of the pill occurs when USG is subsequently involved in a merger or other business combination in the event of a subsequent merger, a holder may purchase either $400 worth of USG stock for $200 (the "flip-in" provision) or $400 worth of the acquiror's stock for $200 (the "flip-over" provision), depending upon the structure of the merger. Because the potential acquiror may not exercise these rights, USG shareholders can dilute the value of the acquiror's ownership by buying additional common shares at a 50 percent discount.

Desert Partners began accumulating shares of USG in July, 1987.[5] Between July 29 and October 5, 1987, Desert Partners acquired more than 5 million shares of USG (9.93 percent of all outstanding shares) for an average price of approximately $45 per share. In late October, 1987 Desert Partners announced its intention to acquire control of USG and met with USG representatives to propose a negotiated transaction. The Company responded to Desert Partners' overtures on October 29, 1987 by filing an action in this court seeking to enjoin Desert Partners from acquiring any additional shares of USG stock.[6] In addition, USG issued a press release stating that it had no interest in participating in a negotiated transaction with Desert Partners.

Desert Partners continued its attempt to negotiate a transaction with USG. On February 24, 1988 Desert Partners notified the USG Board that Desert Partners remained interested in acquiring USG and in consummating a negotiated acquisition. Desert

---

**4.** These defensive maneuvers began in 1976, when the Board approved and submitted to the shareholders a "supermajority" amendment to USG's Certificate of Incorporation. This amendment requires 80% of USG's shareholders to approve any merger with a holder of five percent or more of the company's stock unless either 1) the Board approves the merger before the five percent acquisition, or 2) a majority of the Board members who were elected before the five percent acquisition subsequently approves the merger.

More recently, on February 10, 1988 the USG Board decided to invoke the protection of the new Delaware antitakeover statute. (Day Aff. ¶ 12). This statute, which the Delaware legislature designed to protect shareholders from the coercive aspects of certain tender offers, became effective on February 2, 1988. Although it is subject to numerous exceptions, the statute essentially prevents mergers and other business combinations between shareholders that own 15 percent or more of the target company's stock and the target company for a period of three years after an initial acquisition. *See* 8 Del.C. § 203.

**5.** This court discussed the origins of Desert Partners and its interest in acquiring USG in its earlier memorandum opinion in *USG Corporation v. Wagner & Brown, et al.,* 689 F.Supp. 1483 (N.D.Ill.1988). This opinion discusses these background facts only to the extent to which they are relevant to the current dispute.

**6.** This court denied USG's motion for a preliminary injunction on its claim on February 22, 1988.

Partners presented USG managers with a proposal to acquire 21,500,000 USG shares for $42 per share in cash and the remaining shares for $42 principal amount per share in subordinated debt securities. USG Chairman of the Board Robert J. Day responded that the Board had no interest in discussing Desert Partners' proposal. Desert Partners thereafter made its tender offer directly to USG shareholders.

On March 1, 1988 Desert Partners commenced a two-tiered tender offer for USG shares. On April 11, 1988 Desert Partners amended the terms of its offer and extended its expiration date to April 29, 1988.[7] The first tier of the amended offer consists of an offer to purchase up to 39 million shares (including the associated poison pill Rights) for $42 per share. If Desert Partners consummates the offer's first tier, Desert Partners will own approximately 85 percent of USG's outstanding shares of common stock. In the second tier of the amended offer, Desert Partners proposes to exchange each remaining USG share for securities having an aggregate value of at least $42 per share on a fully distributed basis. Although Desert Partners has not disclosed with certainty the nature of the second tier securities it intends to exchange, the initial offer suggests that Desert Partners will offer a combination of debt securities and warrants to purchase additional stock to each second tier shareholder. (PX at 35).[8]

On March 8, 1988 the USG Board voted to recommend that shareholders reject Desert Partners' offer, concluding that the offer was "wholly inadequate, coercive and not in the best interests of the Corporation and its stockholders." (PX 4 at 2). In its Schedule 14d–4 filing, the Board stated that it took into account several factors in reaching this conclusion:

1) the Board's familiarity with USG's business, financial condition, business strategy and future prospects;

2) the Board's belief that the offer does not reflect USG's long-term value;

3) USG's management presentations concerning USG's financial performance and potential;

4) the presentation of USG's financial advisors and their oral opinion that the price of $42 per share was inadequate;

5) the presentations of USG's legal counsel concerning the Board's obligations under both Delaware corporate law and the federal securities laws;

6) the fact that the offer is a "two-tiered, coercive, front-end loaded offer" for USG shares followed by a "back-end merger for 'junk bonds' and warrants purportedly worth $42 per share;" and

7) the Board's belief that it is in the best interests of the corporation for USG to pursue a course designed to assure its continued corporate independence.

(PX 4 at 3). As a result of this conclusion, the Board decided not to redeem the shareholder Rights under the poison pill. (Clark Dep. at 71). The decision to recommend that USG shareholders reject Desert Partners' offer was unanimous.

On March 11, 1988 Desert Partners issued a proxy statement to USG shareholders. The statement announced Desert Partners' intention to nominate six individuals to run in the May 11, 1988 election for USG Directors. This proxy solicitation states that "a vote in favor of the election of the Desert Partners Nominees should

---

7. Desert Partners conditioned its original tender offer on 1) the inapplicability or invalidity of the Delaware antitakeover statute, and 2) the inapplicability of the supermajority provision in USG's Certificate of Incorporation. (PX3 at 1). Accordingly, in its initial motion for preliminary injunction, Desert Partners sought to enjoin USG from implementing these defenses. Desert Partners' amended offer does not implicate the supermajority provision or the Delaware Antitakeover Act. Consequently, Desert

Partners has abandoned the challenges to these defenses.

8. Specifically, the offer states that Desert Partners is considering 1) $26.50 of subordinated debentures, 2) $15.50 principal amount of pay-in-kind subordinated debentures, and 3) warrants to purchase at least 10 percent of the common stock of the Company after the merger.

indicate your support for the Offer and the Merger and the redemption of the Rights." (DX 13).

Desert Partners claims that the USG Board breached its fiduciary duty to the shareholders by refusing to redeem shareholder Rights under the poison pill. Alternatively, Desert Partners suggests that the poison pill was invalid when the USG Board adopted it. Desert Partners seeks an injunction which either orders USG to redeem the Rights under the poison pill or which declares that the poison pill is invalid.

## DISCUSSION

█ In order to obtain a preliminary injunction, Desert Partners must show

1) that the irreparable harm it will suffer if the preliminary injunction is not granted is greater than the irreparable harm the defendant will suffer if the injunction is granted;

2) that it has a reasonable likelihood of prevailing on the merits;

3) that it has no adequate remedy at law;

4) that it will suffer irreparable harm if the court does not issue the preliminary injunction; and

5) that the injunction will not harm the public interest.

*Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir.1988), citing *Brunswick Corp. v. Jones,* 784 F.2d 271, 273–74 (7th Cir.1986). In this case, Desert Partners bears the burden of establishing the five elements necessary for the issuance of a preliminary injunction. *Brunswick,* 784 F.2d at 273.

█ The typical purpose of a preliminary injunction is to maintain the *status quo* pending the resolution of the merits of a case. *Jordan v. Wolke,* 593 F.2d 772, 774 (7th Cir.1978) (*per curiam*). In this case, Desert Partners seeks more than the *status quo.* It seeks an order requiring USG to take affirmative action. While the Seventh Circuit has recognized situations which justify the issuance of a mandatory

injunction compelling affirmative relief, "mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued." *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982); *Jordan,* 593 F.2d at 774; *Ohio–Sealy Mattress Mfg. Co. v. Duncan,* 548 F.Supp. 75, 77 (N.D.Ill.1982).

## A. BALANCE OF HARMS

█ In *Curtis,* the Seventh Circuit reaffirmed its adherence to the "sliding scale" approach to the preliminary injunction standard. *Curtis,* 840 F.2d at 1296. Under the sliding scale approach, the degree of likelihood of prevailing on the merits that a plaintiff must demonstrate decreases the more heavily the balance of harms weighs in its favor. *Brunswick,* 784 F.2d at 275. Thus, even if Desert Partners "has less than a 50 percent chance of prevailing on the merits, [it] may nonetheless be entitled to the injunction if [it] can demonstrate that the balance of harms would weigh heavily against [it] if the relief were not granted."[9] *Curtis,* 840 F.2d at 1296.

The Seventh Circuit has discussed the balance of harms involved in takeover disputes. *Dynamics Corp. of America v. CTS Corp.,* 794 F.2d 250 (7th Cir.1986) (*Dynamics III*). The *Dynamics* litigation involved a poison pill which the directors of CTS Corporation adopted in response to the hostile tender offer of Dynamics Corporation of America (DCA) for shares of CTS. In reviewing the district court's finding that the balance of harms weighed heavily in favor of neither the board of directors nor the tender offeror, the court noted that:

[i]f the tender offer is blocked, Dynamics will lose an opportunity that may never recur. The present owners of shares in CTS who have tendered them to Dynamics may lose, too, but their loss is easily quantified—it is the difference between the price in the tender offer and the price to which CTS stock falls. The only problem is uncertainty as to how many shares

---

9. In all cases, however, the plaintiff must show that its chance of succeeding on the merits is at least "better than negligible." *Curtis,* 840 F.2d at 1296, n. 5; *Brunswick Corp.,* 784 F.2d at 275; *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 387 (7th Cir.1984).

Dynamics would actually have bought if its offer was oversubscribed, as it was. But, conversely, if the tender offer is not blocked, CTS's shareholders will be irrevocably harmed if, as CTS predicts, they are stampeded into selling their shares to Dynamics for a lower price than the shares would eventually command if the tender offer were defeated, or if shareholders who do not tender are coerced into surrendering their shares later at inadequate prices in a "back-end" deal engineered by a board of directors that Dynamics is expected to control if its tender offer succeeds.

*Dynamics III,* 794 F.2d at 252. The court affirmed the district court's conclusion that these harms were best treated as offsetting.

The concerns expressed by the parties in *Dynamics* are precisely the same as the harms presented here. Desert Partners asserts that, unless the court enjoins USG's poison pill, it will be forced to withdraw its tender offer because its financing is contingent on the removal or invalidity of the Rights plan.[10] Mr. Cottle claims that great harm will result from the court's denial of the injunction because the shareholders will lose a "once in a lifetime" opportunity to sell their shares at a premium over the market price of the stock. USG, on the other hand, claims that it will be irreparably harmed if the injunction is granted because USG shareholders will be vulnerable to this and other inadequate and coercive tender offers.

Like the *Dynamics* court, this court concludes that the harms to the parties as a result of granting or denying this preliminary injunction offset one another. As a result, Desert Partners may only prevail on its motion for a preliminary injunction if it can show at least a 50 percent likelihood of

succeeding on the merits of its claim that the USG Board has breached its fiduciary duty. *Curtis,* 840 F.2d at 1296; *Dynamics III,* 794 F.2d at 252 ("If both parties are likely to suffer the same amount of irreparable harm, so far as estimation is possible, the likelihood of success becomes decisive.").

## B. LIKELIHOOD OF SUCCESS ON THE MERITS [11]

■ Delaware courts have firmly established that a board of directors is ultimately responsible for managing the affairs of a corporation, and that in so doing the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Ivanhoe Partners v. Newmont Mining Corp.,* 535 A.2d 1334, 1341 (Del. Supr.1987); *Revlon, Inc. v. MacAndrews & Forbes Holdings,* 506 A.2d 173, 179 (Del. Supr.1986); *Unocal Corp. v. Mesa Petroleum Co.,* 493 A.2d 946, 953 (Del.Supr.1985). These responsibilities require directors to take an active role in responding to a pending takeover bid. *Dynamics Corp. of America v. CTS Corp.,* 637 F.Supp. 406, 409 (N.D.Ill.1986) (*Dynamics I*).

It is also firmly established in Delaware that the business judgment rule applies when a board of directors adopts defensive mechanisms to thwart potential takeovers. *Pogostin v. Rice,* 480 A.2d 619, 627 (Del. Supr.1984). Under Delaware's business judgment rule, courts presume that directors have made their business decisions on an informed basis, in good faith, and with the honest belief that they acted in the best interests of the company. *Ivanhoe,* 535 A.2d at 1341; *Revlon,* 506 A.2d at 180; *Unocal,* 493 A.2d at 954. A court should not "substitute its judgment for that of the board if the latter's decision can be 'attrib-

---

10. Desert Partners also asserts that it has incurred substantial expense in launching their tender offer. However, any such expenses are compensable in money damages.

11. In deciding whether Desert Partners has shown at least a "better than negligible" likelihood that USG's Board has breached a duty it owes to its shareholders, this court must apply the law of the state of Delaware. *See Shaffer v. Heitner,* 433 U.S. 186, 215 n. 44, 97 S.Ct. 2569,

2585 n. 44, 53 L.Ed.2d 683 (1977); *Young v. Colgate Palmolive Co.,* 790 F.2d 567, 569 (7th Cir.1986) (the law of the state of incorporation governs the liability of officers and directors to the corporation and its shareholders). In construing Delaware law, the task of this court is to predict how the Delaware courts would evaluate USG's defensive strategies. *Dynamics III,* 794 F.2d at 255.

uted to any rational business purpose.'" *Unocal*, 493 A.2d at 954, quoting *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.Supr.1971).

On the other hand, courts in Delaware have also recognized that a conflict of interest confronts directors who are faced with a threat to their control of a corporation. *Dynamics I*, 637 F.Supp. at 409. Because of the threat that the directors may be more concerned about their own interests than the interests of the corporation and its shareholders, "there is an enhanced duty which calls for judicial examination at the threshold before the protections of the business judgment rule may be conferred." *Unocal*, 493 A.2d at 954.

■ In evaluating the directors' actions in defending against the threat of a takeover, the courts therefore place upon the directors the burden of proving 1) that the threatened takeover posed a danger to corporate policy and effectiveness, and 2) that they adopted defensive measures which were reasonable in relation to the threat posed. *Dynamics Corp. of America v. CTS Corp.*, 635 F.Supp. 1174, 1177 (N.D.Ill. 1986) (*Dynamics II*); *Ivanhoe*, 535 A.2d at 1341. The directors satisfy this burden by showing that they acted in good faith and after reasonable investigation. *Ivanhoe*, 535 A.2d at 1341; *Moran v. Household International, Inc.*, 500 A.2d 1346, 1356 (Del.Supr.1985); *Unocal*, 493 A.2d at 955.

To overcome the presumption enjoyed by the directors by virtue of the business judgment rule, the plaintiff has the "burden of persuasion to show a breach of the directors' fiduciary duties." *Moran*, 500 A.2d at 1356. The plaintiff may show this by demonstrating that the directors acted solely or primarily out of a desire to perpetuate themselves in office. *Ivanhoe*, 535 A.2d at 1341.

Some courts have held that a board of directors is more likely to have acted pursuant to honest business judgment if they are independent, or "outside" directors who are less likely to have a conflict of interest

than directors who are also part of management. *See Unocal*, 493 A.2d at 955 (the directors' burden of proof is "materially enhanced" when a majority of the board favoring a proposal consists of outside independent directors who acted in good faith and with reasonable investigation). *See also Ivanhoe*, 535 A.2d at 1343. In this case, eleven of USG's fifteen directors are unaffiliated with USG except through their directorships. (DX 1 at 36). Thus, these directors were more likely than "interested" directors to exercise independent business judgment.[12]

### A. The Validity of USG's Poison Pill

■ Delaware law clearly authorizes corporate directors to adopt poison pill plans to protect their corporation against unfair and hostile takeovers. *See Moran*, 500 A.2d at 1351–53. However, poison pill plans are neither *per se* valid nor *per se* invalid; each must be evaluated individually in light of the circumstances surrounding its implementation. *See Dynamics Corp. of America v. CTS Corp.*, 805 F.2d 705, 712 (7th Cir.1986) (*Dynamics IV*).

The evidence indicates that the USG Board adopted the pill in response "to what it perceived to be the threat in the market place of coercive two-tier tender offers." *Moran*, 500 A.2d at 1356. At the March 20, 1986 meeting Mr. Day summarized for the Board recent coercive takeover activities in the marketplace, and advised the Board that many of these takeovers resulted in breakups of the corporations, self-dealing activities, or unfair and unequal treatment of shareholders. (Day Aff.Ex. C at 2). Moreover, the Board was aware of Mr. Zimmerman's view that USG was a particularly attractive takeover target because the price of USG stock "has not always reflected the true value of the company." (Zimmerman Aff. ¶ 3). USG's Board was reasonable to react to these threats in the marketplace by adopting a poison pill Rights plan.

---

**12.** *But see, Dynamics III*, 794 F.2d at 256, where Judge Posner noted in *dicta* that the potential conflict of interest is "not cured by vesting the power of decision in a board of directors in which insiders are a minority."

In a recent case, the Delaware Supreme Court evaluated the overall reasonableness of a poison pill plan. *Moran v. Household International, Inc.*, 500 A.2d 1346 (1985). In *Moran*, the court held that the directors of Household International, Inc. were protected by the business judgment rule when they adopted a poison pill plan designed to prevent coercive two-tiered tender offers. 500 A.2d at 1356–57. In concluding that the directors of Household International acted reasonably in adopting this plan, the court considered three factors:

1) The poison pill plan did not preclude or otherwise affect a proxy contest for control of Household.

2) The plan was adopted pursuant to the directors' informed business judgment.

3) The plan did not preclude *all* hostile takeovers, but only those which were inadequate or unfair to shareholders.

500 A.2d at 1354–56.

USG's poison pill satisfies the requirements outlined by the *Moran* court. Desert Partners does not allege that USG's rights plan precludes or otherwise interferes with its ability to wage a proxy contest. Moreover, the USG Board clearly adopted the plan pursuant to informed business judgment. The minutes of the February 12, 1986 Board meeting at which the directors initially considered the poison pill plan indicate that the directors received written information concerning the plan and were aware of their legal obligations and "their function in safeguarding the interests of stockholders." (Day Aff.Ex.B. at 2). In addition, at their next meeting on March 20, 1986 the USG Board heard presentations from USG management, representatives of USG's outside legal counsel, and USG's outside investment banker. The

Board evaluated a number of typical Rights plans and their potential effect on the price and value of USG stock. (Day Aff.Ex.C at 2–6). These procedures constituted "good faith and reasonable investigation." *Ivanhoe*, 535 A.2d at 1341.[13]

Finally, USG's poison pill does not preclude all hostile tender offers. The Delaware Supreme Court in *Moran* found that the poison pill was not a complete deterrent to hostile takeovers because an offeror could structure its offer to avoid the provisions of the plan. The court suggested that an offeror could condition its offer on the Board's redemption of the Rights, could condition its offer on receiving a number of shares and Rights that would enable it to override the effects of the plan, or could make the offer and then solicit proxies to remove the current Board and replace it with individuals who were willing to redeem the Rights. 500 A.2d at 1354. In this case, Desert Partners has structured its tender offer for USG shares in such a way as to avoid the provisions of the poison pill. Thus, although a takeover may be more expensive with the poison pill in place, such a takeover is not impossible.

Desert Partners asserts that USG's poison pill plan is unreasonable because the exercise price is not reasonably related to the market price of USG stock. At the March 20, 1986 board meeting, Salomon Brothers represented to the USG Board that the exercise price of a poison pill is typically 200% to 500% of the market price of the company's stock.[14] On the day that the Board set the exercise price, USG stock closed at 66⅜. By setting the exercise price at $200, the Board selected a penalty which was 300% of the market price of the stock. (Day Aff.Ex.C. at 7). Thus, the

---

**13.** *See also* Day Aff. ¶ 3, which states that the Board "heard extensive discussions, reviewed written materials and listened to briefings by legal and financial experts on corporate takeover issues, including coercive takeover tactics" before adopting the proposal.

**14.** Mr. Zimmerman explained that a poison pill should contain an exercise price which relates to a long-term concept of value rather than be chosen arbitrarily. He stated that "the purpose of the Rights plan is to try to protect long-term

value for the shareholders and it is important that the price of the Rights plan bear some relationship to the anticipated future values of the enterprise as represented by the stock price." (Zimmerman Dep. at 108). This court will assume for the purposes of this discussion that Salomon Brothers' range of typical ratios is an accurate and accepted measure for assessing the reasonableness of a poison pill's exercise price.

penalty ratio was well within the range which Salomon Brothers asserted was reasonable at the time the Board set the exercise price.

Desert Partners asserts that the Rights Plan is nonetheless invalid because the Board failed to adjust the exercise price after it declared stock split on May 16, 1986. This stock split reduced the market price of each share to 34⅜ and increased the poison pill penalty to 567% of the price of USG's stock. (Zimmerman Aff. ¶ 7). However, neither the Board's actions after adopting the poison pill plan nor natural market variations bear on the pill's validity. The penalty has fluctuated widely due to market variations in the price of USG stock.[15] The court cannot require the Board to modify the exercise price in response to every fluctuation in the stock price.

The evidence indicates that the USG Board of Directors adopted the poison pill as a response to the danger of unfair takeovers and in order to safeguard their shareholders' interests. Desert Partners has not introduced any evidence indicating that the Board acted in any way hastily or unreasonably. Moreover, on the evidence before the court at this time it appears that the plan is "reasonably related to the goal of shareholder wealth maximization." *Dynamics*, 805 F.2d at 708. This court therefore concludes that the directors have met their burden of showing that the business judgment rule protects their decision to adopt this poison pill.

To overcome the directors' protection, Desert Partners must show that the directors acted solely or primarily to perpetuate themselves in office. *Ivanhoe*, 535 A.2d at 1341. In the case before this court, it is clear that the members of USG's Board did not adopt their poison pill in order to entrench themselves in office. First, USG's Board adopted the poison pill Rights plan before the need arose to respond to any particular takeover threat.[16] *See Moran*, 500 A.2d at 1350. Moreover, the evidence clearly indicates that USG's sole motivation in adopting the Rights plan was to protect the investments and other interests of USG shareholders. Several USG directors and officers testified that the Board adopted the poison pill in order to protect shareholder interests. (Clark Dep. at 10; cotting Dep. at 89; Miller Dep. at 16; Day Aff. ¶ 3. *See also* Zimmerman Aff. ¶ 5). At the Board meeting on March 20, 1986, the Board heard a presentation which explained that the poison pill was designed to deter self-dealing and other unfairness.[17] Even the materials concerning the Rights plan which the Board ultimately sent to the shareholders suggest that the Board adopted the plan to preclude unfair or coercive acquisitions.[18] USG's Board reiterated their motives in adopting the poison pill in their 1986 Annual Report.

---

**15.** For example, the stock market crash of October 19, 1987 caused the trading price of USG stock to fall from 55½ on October 5, 1987 to 26½ on October 20, 1987 and the penalty to rise from 360% to about 750% of the trading price. (PX 25).

**16.** The uncontroverted evidence indicates that USG adopted the poison pill in 1986. Desert Partners' Schedule 13D of October 27, 1987 indicates that Desert Partners made its initial purchases of USG stock in July, 1987. Thus, USG adopted its poison pill well before Desert Partners expressed an interest in acquiring control of USG or even made its first acquisitions of USG stock.

**17.** The minutes indicate that

the adoption of a rights plan will not prevent a takeover of the Corporation, but rather might deter an attempt to acquire it in a manner or upon terms not approved by the Board or an attempt by a stockholder owning a controlling block of stock from taking advantage of the stockholders through self-dealing transactions.

(DX 6 at 3).

**18.** These materials state that the rights

are intended to protect stockholders in the event of an unsolicited attempt to acquire the Corporation. While your board is unaware of any such attempt at present, we are concerned that various tactics which we consider to be disruptive to the Corporation and inequitable to the stockholders have become relatively commonplace in corporate takeover practice.... We believe that such tactics often unfairly pressure stockholders without giving them any real choice, may deprive stockholders of the full value of their shares, and may severely disrupt the conduct of the Corporation's business.

(Day Aff.Ex.D at 2).

The report states that the Board adopted the Rights plan "to protect stockholders in the event of an unsolicited attempt to acquire the Corporation." (PX21 at 2).

Desert Partners has failed to show that the directors breached their fiduciary duty when they adopted USG's poison pill. Consequently, Desert Partners is not entitled to an injunction preventing the Board from implementing this defense on the ground that it is invalid.

## B. *Reasonableness of USG's Response to Desert Partner's Offer*

 Section 23(a) of the Rights Agreement gives the USG Board the authority to redeem the Rights for a nominal amount at any time prior to an announcement that an acquiror has become the beneficial owners of 20 percent or more of USG stock. In evaluating Desert Partners' claim that the USG · Board should have redeemed the Rights under the poison pill, the court must evaluate the Board's action in light of the three factors outlined by the Delaware Court in *Ivanhoe*. *See Moran*, 500 A.2d at 1354 ("The Board has no more discretion in refusing to redeem the Rights than it does in enacting any defensive mechanism.").

The first factor in the *Ivanhoe* analysis is whether the USG Board was reasonable to perceive that Desert Partners' offer threatened USG's corporate policy and effectiveness. *Ivanhoe*, 535 A.2d at 1341. USG first claims that Desert Partners' offer, if consummated, would threaten USG's policy of corporate growth through implementation of a long-term business strategy. However, Desert Partners has not expressed an intent to alter the current course of USG operations. Nothing in the record indicates that Desert Partners' ownership would reduce shareholder values, or that Desert Partners' ownership otherwise would adversely affect the corporation.[19] Consequently, USG's claim that Desert Partners would injure USG by abandoning its long-term strategies is not persuasive.

The USG Board also believes that Desert Partners' offer is coercive and therefore threatens the interests of USG shareholders. Recent Delaware decisions recognize that two-tiered tender offers tend to coerce shareholders into tendering their shares in order to avoid a disadvantageous second-tier transaction. *See Ivanhoe*, 535 A.2d at 1342; *Moran*, 500 A.2d at 1357 n. 14; *Unocal*, 493 A.2d at 956. As the court noted in *Unocal*,

> It is now well recognized that [two-tiered offers] are a classic coercive measure designed to stampede shareholders into tendering at the first tier, even if the price is inadequate, out of fear of what they will receive at the back end of the transaction.

493 A.2d at 956.

Wholly aside from the adequacy of the offer price, the first tier of Desert Partners' offer appears more attractive than the second tier. Desert Partners offers $42 per share in cash for all shares tendered during the first tier and asserts that the second tier will involve values equal to at least $42 per share. The fact that Desert Partners offers the same second tier value as the first tier does not remove the coercive effect of the offer.[20] Nor does the fact that Desert Partners has offered

---

**19.** The Board asserts that Desert Partners' reputation as "corporate raiders" and "greenmailers" suggests that Desert Partners has no intention of effectively managing the corporation. It is true that the court may consider an offeror's past acquisition history in deciding whether a takeover poses a threat to the corporation. *See Ivanhoe*, 535 A.2d at 1342; *Unocal*, 493 A.2d at 956. However, in this case, Desert Partners does not appear to be seeking greenmail. In a communication to USG management which Desert Partners appended to its tender offer, Desert Partners indicated that it wished "to further enhance USG's long-term value to stockholders, ... to improve USG's competitive posi-

tion and build upon USG's other existing strengths." (PX3 at 31). Desert Partners further asserted that it "is genuinely interested in acquiring USG," and is "not seeking and will not accept 'greenmail' from the company." *Id.* This evidence counters USG's unsupported assertion that Desert Partners' ownership would harm USG shareholders.

**20.** Indeed, the *Unocal* court found a tender offer to be coercive despite the fact that the offeror proposed a first tier value of $54 cash and a second tier value of $54 in securities. *Unocal*, 493 A.2d at 956.

first tier cash to 85 percent of USG's shareholders eliminate the coercive aspects of the offer. The Board's commitment to safeguarding the value of minority shares exists even if the minority is only a few percent of USG's total shares.

The offer remains coercive because the second tier is much more uncertain than the first tier. Desert Partners has not specified the nature of the second tier securities, but suggests only an indefinite combination of bonds and warrants. Moreover, the offer specifically reserves to Desert Partners the right to change the nature or terms of the merger or the amount of consideration it offers in the event that the merger is delayed or general economic or market conditions worsen. These factors indeed may coerce shareholders into tendering their shares to avoid any subsequent change in Desert Partners' merger plans. USG reasonably perceived that the two-tiered offer threatened USG's corporate effectiveness.

It was also reasonable for USG to perceive that the price of Desert Partners' offer threatens the corporation.[21] The Board reached the conclusion that the price was inadequate only after careful evaluation. For nearly five hours on March 8, 1988 the Board heard management's presentations concerning USG's future financial prospects and potential. Representatives of Salomon Brothers and Goldman, Sachs presented their opinion that the offer was inadequate after analyzing the price relative to various reflections of USG's earnings and earnings potential and comparing the relative strength of USG's offer to the strength of offers made in comparable transactions. The Board relied on these analyses and their own judgment in concluding that $42 per share is too low compared to the "long-range capability or potential of the company." (Clark Dep. at 46; Cotting Dep. at 91; Day Dep. at 75, 95; Miller Dep. at 26).

Although USG engaged in significant discussions before rejecting Desert Partners' offer, Desert Partners points out that USG made no attempt at any point to estimate the value of the company over the long term. Neither the directors nor their investment bankers have developed a range of prices that adequately reflects the company's value. (Clark Dep. at 46, 53–54; Fox Dep. at 98; Miller Dep. at 114; Day Dep. at 42; Weiss Dep. at 22; Zimmerman Dep. at 36; Mendell Dep. at 69).

However, the fact that USG did not pinpoint the long-term value of the company's shares does not render its analysis inadequate under Delaware law.[22] Although the directors did not value the company in terms of stock price, they did utilize other concrete factors to assess the value of the company.[23] The Board's projections are not unreasonable in light of all the economic factors it considered.[24] Any slight decline in some of USG's performance indicators is overshadowed by USG's widely recognized history of superior performance in the building products industry. (Zimmerman Aff. ¶ 2 and exhibits). In addition, at least one director specifically noted his confidence in USG's ability to adapt to a changing environment and changing market conditions. (Cotting Dep. at 72–73).

In sum, the USG Board undertook a careful analysis of USG's performance potential in relation to Desert Partners' offer.

---

21. An inadequate price, especially in light of the coercive nature of the offer, clearly threatens a corporation's effectiveness and the wellbeing of its shareholders.

22. Cf. *Dynamics I*, 637 F.Supp. at 413, where the district court noted that the directors' statements that CTS' tender offer price reflected neither the current nor the long-term value of the company unpersuasive absent financial data to support them.

23. The evidence indicates that the directors reviewed the revenue and income forecasts of each corporate division, historical economic trends in the market, and USG's past performance and future performance potential. (Cotting Dep. at 69–73; Clark Dep. at 45–57; Fox Dep. at 78).

24. While the Board may have acknowledged a decline in housing starts in the next few years, the Board also predicted an increase in the repair and remodel segment of the construction market (Miller Dep. at 28, 29), less volatility in USG's end markets, and increasing international sales. (Day.Aff.Ex.F at 1–2).

Consequently, this court will not interfere with the Board's conclusion that Desert Partners' offer is coercive and inadequate and therefore presented a threat to USG's corporate effectiveness.

The second factor in the *Ivanhoe* analysis is whether the Board fashioned a defensive strategy which was reasonable in relation to this threat. The Board decided that the company's continued independence would result in greater value to shareholders than Desert Partners' $42 offer. (Clark Dep. at 89; Cotting Dep. at 40–41; Fox Dep. at 62). Consequently, because it reasonably concluded that Desert Partners' offer was inadequate and coercive, the Board concluded that "USG's shareholders are entitled to and require the continued protection of the Company's Rights plan." (Zimmerman Aff. ¶ 20).

The Board did not breach its fiduciary duty by refusing to negotiate with Desert Partners to remove the coercive and inadequate aspects of the offer. USG decided not to bargain over the terms of the offer because doing so would convey the image to the marketplace "that 1) USG was for sale—when, in fact, it was not; and 2) $42/share was an "in the ballpark" price—when, in fact it was not." (Day Aff. ¶ 11). Once a Board decides to maintain a company's independence, Delaware law does not require a board of directors to put their company on the auction block or assist a potential acquiror to formulate an adequate takeover bid. *Ivanhoe*, 535 A.2d at 1345.[25] In this case, the Board has neither put the company up for sale nor entertained a bidding contest. (Cotting Dep. at 84, 89–90, 123; Clark Dep. at 44, 58; Fox Dep. at 58–59, 65, 130; Miller Dep. at 151, 17; Weiss Dep. at 56–57; Zimmerman Aff. ¶¶ 20, 21). It therefore had no duty to negotiate with Desert Partners over the terms of its offer.

In sum, the USG Board has met its burden of showing that it reasonably perceived Desert Partners' offer to threaten USG's corporate policy and effectiveness and that it responded to this threat with a reasonably related defensive strategy. Desert Partners therefore must rebut the directors' good faith and reasonable investigation by showing that the Board acted in order to entrench themselves.

Desert Partners has shown no direct evidence of an entrenchment purpose on the part of USG's management. Rather, Desert Partners requests the court to infer an entrenchment motivation from a combination of factors. First, Desert Partners asserts that USG's "entire response to Desert Partner's offer, from beginning to end, was forecast by their knee-jerk reaction upon learning that Desert had purchased some five million shares." (P's Supp. Brief at 15). Specifically, Desert Partners contends that USG's initial motion for preliminary injunction, interest in remaining independent, and alleged failure to engage in reasonable investigation indicates that USG's interest was in "stopping the tender offer ... at all costs." *Dynamics*, 637 F.Supp. at 417. However, these factors do not indicate an entrenchment scheme. The Board's careful evaluation of Desert Partners' offer refutes any claim that the Board regarded Desert Partners' offer primarily as a threat to its own incumbency.

Desert Partners also asserts that the Board's failure to negotiate with Desert Partners to formulate a tender offer with acceptable terms indicates an entrenchment motivation. However, as previously mentioned, the USG Board was under no obligation to negotiate with Desert Partners or to assist in developing an adequate proposal.

Finally, Desert Partners asserts that the outside directors' financial incentives for serving on the USG Board indicate a motivation to preserve their incumbency. This assertion is likewise without merit. As the Seventh Circuit has stated, "[a] lack of disinterest cannot be equated to bad

---

**25.** In *Ivanhoe*, the Delaware court reaffirmed the principle set out in *Revlon* that a Board's fiduciary duty "changes from the preservation of the company as a corporate entity to the maximization of the company's value at a sale for the stockholder's benefit" only when "the break-up of a company is inevitable." *Ivanhoe*, 535 A.2d at 1344; *Revlon*, 506 A.2d at 182.

faith or procedural unfairness; otherwise defensive measures would be unlawful per se, which they are not." *Dynamics IV,* 805 F.2d at 711. Moreover, USG asserts that some Board members in fact have little financial incentive to resist Desert Partners' offer. Mr. Day states in his affidavit that certain members of USG's senior management are near retirement and stand to gain only slightly more than their retirement packages allow should they be forced to retire early. (Day Aff. ¶ 5). In addition, Mr. Day's "golden parachute" contract would earn him *more* money if Desert Partners' offer succeeds than he will earn if it fails and he continues as a USG director and officer.[26]

In conclusion, the materials before the court do not suggest that the directors acted pursuant to an entrenchment scheme. Desert Partners has not shown a probability of success on the merits of its claim that the USG Board breached its fiduciary duty. Even if this court were persuaded that Desert Partners had shown a "better then negligible" likelihood of success on the merits, Desert Partners has not shown that the balance of harms weighs substantially in favor of this court granting injunctive relief. Because Desert Partners has not shown a likelihood of success on the merits, the court need not consider the other factors of the preliminary injunction standard.

### CONCLUSION

For all the foregoing reasons, Desert Partners' motion for a preliminary injunction is DENIED.

---

**26.** Mr. Day's affidavit also indicates that the Board had no reason to entrench it because Desert Partners represented and the Board believed that Desert Partners would retain them as directors. Likewise, the tender offer states that Desert Partners would "seek to retain existing management of the Company." (PX3 at 41). However, in their presentation to the directors at the board meeting on March 8, 1988—the meeting at which the directors voted to recom-

mend that the shareholders reject Desert Partners' offer—USG's investment advisors informed the Board that Desert Partners intended to solicit proxies in order to elect a new slate of directors. Desert Partners in fact began to solicit these proxies on March 11, 1988. Thus, the USG directors were aware that the composition of the board was likely to change should Desert Partners successfully complete its acquisition.